# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ANTHONY COLUCCI, VANESSA
LORRAINE SKIPPER, KELLY BAKER
Individually and on Behalf of Those Similarly
Situated,

        Plaintiffs,

   v.

HEALTH FIRST, INC.,

        Defendant.

No. _____

**JURY DEMANDED**

**DAMAGES AND
INJUNCTIVE RELIEF
SOUGHT**

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

PARTIES .............................................................................................................2

JURISDICTION AND VENUE ............................................................................4

INTERSTATE TRADE AND COMMERCE ........................................................4

DEFINITIONS OF RELEVANT MARKET ........................................................5

   Product Market: Acute Care Services ................................................................5

   Geographic Market: BC or SBC........................................................................6

DEFENDANT'S MARKET POWER ....................................................................8

DEFENDANT'S MONOPOLIZATION AND RESTRAINT OF TRADE AS TO THE SALE OF ACUTE CARE SERVICES ........................................................9

   *Leveraging Control Over Its Health Plans In Aid of Referral Exclusive Dealing* ..............................................................................................................11

   *Financial Inducements and Preferential Treatment In Aid of Referral Exclusive Dealing and Group Boycott* ............................................................14

   *Revocation of Hospital Privileges in Aid of Referral Exclusive Dealing* ............15

   *Coercive Threats in Aid of Referral Exclusive Dealing and Group Boycott* .......17

   *Coercive Retaliation in Aid of Referral Exclusive Dealing and Group Boycott*..17

   *MIMA Acquisition Strengthens Referral Exclusive Dealing*...............................21

   *Market Allocation Agreements* .............................................................................21

CLASS INJURY AND STANDING......................................................................22

CLASS ALLEGATIONS ......................................................................................24

   Acute Care Damage Class ..................................................................................24

   Federal Rule of Civil Procedure 23(a) Prerequisites...........................................24

   Federal Rule of Civil Procedure 23(b)(3) Prerequisites......................................26

   Acute Care Injunctive Class ...............................................................................26

   Federal Rule of Civil Procedure 23(a) Prerequisites...........................................26

   Federal Rule of Civil Procedure 23(b)(2) Prerequisites......................................28

CAUSES OF ACTION..........................................................................................28

FIRST CLAIM FOR RELIEF ..............................................................................28

Monopolization of the Acute Care Market in Violation of Section 2 of the Sherman Act ................................................................................................28

SECOND CLAIM FOR RELIEF .............................................................................29

Agreements in Restraint of Trade in Violation of Section 1 of the Sherman Act ......................................................................................................................29

THIRD CLAIM FOR RELIEF ..................................................................................30

Violation of the Florida Antitrust Act ................................................................30

PRAYER FOR RELIEF ............................................................................................31

On behalf of themselves and those similarly situated, Anthony Colucci, Vanessa Lorraine Skipper, and Kelly Baker ("Plaintiffs") bring this action against Health First, Inc. ("Health First" or "Defendant") and allege as follows:

## **INTRODUCTION**

1.     This case arises from the pervasive and long-term exclusionary misconduct that Health First has committed in the market for acute care and that this Court has already scrutinized. In *Omni Healthcare Inc. v. Health First*, No. 6:13-cv-1509-Orl-37DAB (filed Sept. 27, 2013) (Dalton, J.), physician competitors of Health First sought to recover profits lost due to Health First's anticompetitive conduct. After one day of trial, on August 16, 2016, Health First agreed to settle and the case was voluntarily dismissed. (ECF No. 329.)

2.     Unfortunately, Health First was unchastened. After the *Omni Healthcare* settlement, Health First continued its efforts to maintain and strengthen a monopoly in the market for acute care, and restrained trade, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. Health First achieved these anticompetitive ends through exclusionary acts suppressing and injuring competition, including acquiring the largest competing physician group, Melbourne Internal Medical Associates; leveraging its market power in adjacent markets into the acute care market; pervasive and highly effective exclusive dealing in hospital referrals; and a group boycott of competitors.

3.     Health First's monopolization and restraint of trade foreclose competition from both rival acute care hospitals in Brevard County or Southern Brevard County ("BC" and "SBC," respectively) and from potential market entrants, since all need access to physicians and their referrals to compete effectively in the acute care market. Defendant has caused its competitors harm in the form of lost profits; at the same time, it has caused the health plans who pay its bills harm in the form of overcharges for services, well above the fees that the health plans would pay in a competitive market. And it has delivered sub-par care to its patients, threatening their health and longevity.

4.     On behalf of itself and similarly situated health plans, Plaintiffs seek damages for Health First's above-competitive fees charged in the market for acute care in BC or SBC (the "acute care relevant market"). Plaintiffs also seek injunctive relief to bring Health First's long history of exclusionary conduct to an end.

## PARTIES

5.     Plaintiff Anthony Colucci resides at 5644 Reagan Avenue, Titusville, FL 32780. Mr. Colucci is the President of the Brevard Federation of Teachers, 1007 South Florida Avenue, Rockledge, FL 32955. Mr. Colucci previously served as its Vice President and, prior to accepting this position, he was employed as a teacher for 16 years at Oak Park Elementary in Titusville, FL. Over the last several years his

family has used acute care services provided by Health First and made substantial co-insurance payments to Health First for this care.

6.    Plaintiff Vanessa Lorraine Skipper resides at 1847 Abbeyridge Drive, Merritt Island, FL 32953. Ms. Skipper has served as Vice President of the Brevard Federation of Teachers, 1007 South Florida Avenue, Rockledge, FL 32955, since 2018. Prior to assuming this position, she was employed as an English teacher at Cocoa High School, Cocoa, FL. In the last several years she has used acute care services provided by Health First and made substantial co-insurance payments to Health First for this care.

7.    Plaintiff Kelly Baker resides at 2682 Vining Street, West Melbourne FL 32904. Ms. Baker is employed as a teacher of Fashion Design and Career Elective at Palm Bay Magnet High School, Melbourne, FL. In the last several years she has used acute care services provided by Health First and made substantial co-insurance payments to Health First for this care.

8.    Health First is a not-for-profit corporation organized and existing since 1995 under Florida law, with its principal place of business in SBC. Health First Inc. is the parent corporation of four affiliated hospitals located in BC: Holmes Regional Medical Center, Cape Canaveral Hospital Inc., Palm Bay Hospital, and Viera Hospital, Inc. Health First is also the parent corporation of subsidiaries that manage physician groups ("HF Physicians") and administer health plans ("HF Health

Plans"). Health First bills itself as "Central Florida's only fully integrated health system."

## JURISDICTION AND VENUE

9.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Plaintiffs seek statutory damages and injunctive relief from ongoing violations of the antitrust laws of the United States, specifically, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

11.     This Court has personal jurisdiction over Health First because it resides in this District; transacts business in this District; and commits overt acts in furtherance of the illegal scheme and conspiracy alleged herein in this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because Health First has resided, transacted business, has been found, and has agents in this District; most or all of the events giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce at issue has been carried out in this District.

## INTERSTATE TRADE AND COMMERCE

13.     The conduct of Health First and its co-conspirators has been within the flow of and substantially affected interstate commerce.

4

14.     During the relevant period, a large percentage of Health First's revenues have come from sources located outside of Florida, including the federal government (through the Medicare and Medicaid programs).

15.     Health First purchases a substantial portion of its medicine and supplies from sellers located outside of Florida.

16.     Many employers that have made payments to Health First (either directly or through health insurers) sell products or services in interstate commerce.

## DEFINITIONS OF RELEVANT MARKET

### Product Market: Acute Care Services

17.     The relevant product market with respect to Health First's misconduct encompasses the sale of acute care services. These are short-term health-care treatments that patients receive at a hospital to address an acute, trauma or urgent need. They may or may not require admissions for overnight stays at the hospital.

18.     There are essentially no substitutes for acute care services, and consumer demand for these services is generally inelastic because such services are often necessary to prevent death or long-term harm to health. As a result, there is extremely low cross-elasticity of demand between acute care services and outpatient services not requiring use of hospital services.

19.    In addition, the choice of hospital acute care services is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.

20.    Accordingly, a monopolist can impose a small but significant price increase in the price of acute care hospital service without causing patients to switch to outpatient services or other health care options.

### Geographic Market: BC or SBC

21.    The relevant geographic market for the sale of acute care services with respect to Health First's misconduct is BC or SBC.

22.    The hospital facilities located in BC would have the economic power, if acting collectively, to increase prices for acute care services above competitive levels.

23.    The outflow rate (those BC residents who receive acute care services at hospitals outside of BC) is low and has not varied significantly year-to-year, despite Health First's above-competitive prices and less-than-competitive quality of care. The inflow rate (those residents outside of BC who receive acute care inside BC) is also low and has not varied significantly year-to-year despite changes in relative prices.

24.    The low outflow and inflow rates for this service support the conclusion that acute care hospitals located outside of BC do not provide sufficient competitive

discipline to those within BC to warrant their inclusion in the relevant geographic market. There is extremely low cross-elasticity of demand between acute care hospitals located inside and outside of BC.

25.    Only physicians can admit patients to hospitals, and there is little overlap between the physicians who admit to acute care hospitals located within BC and those who admit to hospitals outside of BC.

26.    Acute care hospitals located within BC offer prices to managed care plans without regard to prices charged to those plans by non-affiliated acute care hospitals located outside BC.

27.    Acute care hospitals located outside BC offer prices to managed care plans without regard to prices charged to those plans by non-affiliated acute care hospitals located within BC.

28.    Managed-care plans cannot substitute acute care hospitals, or physicians, located outside BC for hospitals and physicians located within that area.

29.    Patients located within BC typically do not utilize acute care hospitals, or physicians, located outside BC for acute care hospital or physician services available within BC.

30.    Hospitals located within BC have the ability to raise prices at least 5 percent higher than the prices that would prevail in a competitive market without losing enough volume to make this price increase unprofitable.

7

31.    In the alternative, if BC is not a discrete regional market for acute care hospital services, the allegations in paragraphs 17-30 apply with equal or greater force to SBC, a geographic area within BC.

32.    Indeed, Defendant itself has argued that SBC is a separate geographic market for antitrust purposes. This assertion was made in a 1995 Submission to the Federal Trade Commission ("FTC") in support of the then-proposed affiliation of Cape Canaveral Hospital and Holmes RMC. In that submission, Health First argued that the combination of the two facilities would not reduce competition because the two hospitals were in different geographic markets. Health First's argument to the FTC was successful and, as a consequence, the FTC elected not to challenge the transaction. There has been no material difference between hospital usage patterns over time.

33.    In addition, in a Certificate of Need Application submitted in 2004, Holmes RMC identified "South Brevard" as a "natural market area."

## DEFENDANT'S MARKET POWER

34.    In 2014, Health First had an 86.8 percent share of the market for acute care services in SBC (as measured by patient admissions). This market share has increased in subsequent years. Health First's share of the same product market in the broader BC market is currently estimated at greater than 90 percent.

35.     Health First's market power in both of the geographic markets is also demonstrated by (1) its ability to exclude rival providers of acute care services; and (2) its ability to raise prices to patients and health plans well above competitive levels.

36.     Barriers to entry in the market for the sale of acute care services in BC or SBC make new entry difficult, costly, unlikely, and untimely. Building an acute care hospital is expensive and time-consuming.

37.     With the sole exception of Wuesthoff Medical Center, Melbourne ("Wuesthoff-Melbourne"), for example, no new competitive hospital has built an acute care hospital in SBC in at least 15 years, despite prices well above competitive levels that would attract entry in a competitive product market.

### DEFENDANT'S MONOPOLIZATION AND RESTRAINT OF TRADE AS TO THE SALE OF ACUTE CARE SERVICES

38.     Health First was formed in 1995 by the joining of Holmes Regional Medical Center ("Holmes RMC") and Palm Bay Hospital (located in SBC) and Cape Canaveral Hospital (located in Central Brevard County). Health First was at this time the sole provider in SBC because it controlled the only two acute care hospitals in the county. The only acute care hospital competitor to enter the relevant market since that time has been Wuesthoff-Melbourne in 2002.

39.    Health First has unlawfully maintained its monopoly and restrained trade by using its existing leverage over physicians in order to minimize the possibility of referrals to other acute care hospitals.

40.    Physicians practicing in relevant specialties in these geographic markets are dependent on Health First in multiple respects, including because the Health First health plans provide them with patients and the Health First hospitals provide them with facilities and admitting privileges.

41.    As a result, physicians are at the mercy of Health First's enormous market power. Referrals from such physicians are in turn necessary for any hospital to compete with Health First's established facilities.

42.    Accordingly, Health First can substantially foreclose competition and maintain and strengthen its monopoly by preventing physicians from referring to other hospitals. The techniques that Health First employs to impose barriers to entry have included:

     a.     leveraging of its market power in health plans in aid of exclusive dealing in referrals ("referral exclusive dealing");

     b.     financial inducements to independent physicians to induce referral exclusive dealing and group boycott;

     c.     revocation of hospital privileges in aid of referral exclusive dealing;

d.      coercive threats in aid of referral exclusive dealing and group boycott;

e.      retaliation in aid of referral exclusive dealing and group boycott;

f.      the acquisition of the independent physician group MIMA in aid of referral exclusive dealing; and

g.      market allocation agreements with potential competitors including Adventist HealthCare.

43.     Health First's willful maintenance of its market power over the relevant market has excluded actual or potential competing hospitals within the market, injuring competition and materially causing antitrust price injury, as well as diminishing patients' quality of care.

### *Leveraging Control Over Its Health Plans In Aid of Referral Exclusive Dealing*

44.     Health First vertically integrated into the market for physician services and the market for the sale of health-insurance plans in SBC. In 1995, it formed its own physicians group, HF Physicians. In 1996, it created HF Health Plans to offer HMO plans in BC.

45.     Health First has long recognized its market power in the relevant market. When the head of the Central Brevard Health Care Coalition urged Michael Means, then President of Health First, to improve its health information system, he responded that he was not compelled to because "he was a monopolist."

11

46.     Holmes RMC (formerly known as Brevard Hospital) opened in 1937 and is the largest hospital in BC. It is also the only hospital in SBC with a Level II Trauma Center, Level II Neonatal Intensive Care Unit, and air ambulance (First Flight helicopter).

47.     Due to its size and unique offerings, Holmes RMC is considered what healthcare experts refer to as a "must-have" hospital. In other words, any health plans that intend to market their products in BC have little choice but to include Holmes RMC in their networks. Wuesthoff-Melbourne, Health First's only hospital competitor in SBC, is too small to provide the same range of services that Holmes RMC provides. As a result, it provides only limited competition.

48.     Once Health First secured its dominance over acute care in BC, it acted to maintain and strengthen this dominance.

49.     First, Health First leveraged its market power in the relevant acute care market into the adjacent market for the sale of private health insurance sold by HF Health Plans by exploiting Holmes RMC's "must have" status to require competing private health plans to include *all* Health First hospitals in their network as a precondition for including Holmes RMC. Accordingly, all health plans have been purchasing acute care services on behalf of their enrollees from the heavily-dominant Health First hospitals in BC (and SBC), making it less likely they would be sent to Health First's lone hospital competitor.

50.    Second, HF Health Plans has achieved a dominant share in this market for the sale of private health plans in BC (and SBC) and it has used that dominance to strengthen Health First's existing monopoly power. HF Health Plans covers more insured patients than any other private health plan in the relevant geographic markets. And Health First has assiduously leveraged this power into the physician services relevant market by denying competing independent physicians access to patients enrolled in HF Plans unless they make patient referrals exclusively to Health First's hospital monopoly (and to HF Physicians) thereby suppressing actual or potential acute care competition. Health First's competitors need such referrals to compete effectively and at the necessary scale.

51.    As an example, Jerry Senne was the President and Chief Executive Officer at Holmes RMC, and the founding President and Chief Executive Officer of HF Health Plans. He informed OMNI Healthcare, Inc. ("OMNI") that it could participate in the network for HF Health Plans only if it agreed to admit its patients exclusively to Health First's hospitals.

52.    In March 2004, Senne met with OMNI physician Dr. Seminer and offered to allow OMNI to remain a participating member of HF Health Plans in exchange for an agreement by OMNI to admit its patients exclusively to Health First's hospitals.

13

53.     Ultimately, after repeated attempts to coerce OMNI into admitting exclusively to Health First's hospitals, Health First refused to renew OMNI's contract with HF Health Plans. Instead, it demanded that OMNI's physicians contract individually with HF Health Plans as opposed to contracting as a group.

54.     This has the effect of inducing competing, independent physicians to stop competing with Health First physicians by either joining HF Physicians (and therefore referring patients only to Health First hospitals) or joining nominally "independent" groups cooperating with Health First by entering into either explicit or implied exclusive dealing arrangements that refer all patients to Health First hospitals. Health First thus uses its health plans to strengthen its market power in the relevant market.

55.     Health First's effective power to exclude and exclusionary conduct is demonstrated by the fact that physicians who participate in HF Health Plans send only 15 percent of their *non*-HF Health Plans patients (whom they could send anywhere) to Wuesthoff-Melbourne. In contrast, physicians who do not participate in HF Health Plans utilize Wuesthoff-Melbourne 45 percent of the time.

56.     This anti-competitive leveraging continues to this day.

### Financial Inducements and Preferential Treatment
### In Aid of Referral Exclusive Dealing and Group Boycott

57.     Health First had *de facto* exclusive dealing arrangements with Melbourne International Medical Associates ("MIMA"), before its acquisition, in

aid of its referral exclusive dealing. Health First induced MIMA's physicians into admitting exclusively or nearly exclusively to Health First hospitals by offering financial inducements and preferential treatment. One inducement was to grant MIMA the right to provide radiation-therapy services to Health First's members, with Health First shutting down its competing radiation-therapy department and selling its equipment to MIMA. That radiation oncology program became the most profitable of all of MIMA's ancillary services.

58.    Prior to its acquisition by Health First, MIMA had over 100 doctors and 10,000 hospital admissions a year. Only one percent of those admissions occurred at Wuesthoff-Melbourne. It has offices within the range of one to three miles from Wuesthoff-Melbourne and has moved its building and main headquarters closer to Wuesthoff-Melbourne.  Yet it still does not utilize Wuesthoff-Melbourne.

59.    Health First continues to provide financial inducements to providers to maintain anti-competitive exclusive dealing arrangements and prevent competitors from gaining share in the relevant markets. As with MIMA, these inducements involve agreements not to compete in certain specialties or areas of care.

### *Revocation of Hospital Privileges in Aid of Referral Exclusive Dealing*

60.    Health First has also coerced referral exclusive-dealing arrangements from competing independent physicians by revoking or threatening to revoke patient

referrals *from* its hospitals to these physicians, as well as revoking their hospital privileges.

61.     Without hospital privileges, a physician cannot perform services at a Health First hospital. Of course, such revocations or threats of revocations are particularly powerful exclusionary tools due to Health First's acute care monopoly in BC (and SBC) and Holmes RMC's status as a "must have" hospital in the geographic market.

62.     A substantial portion of Dr. Brian Dowdell's practice (as many as ten to fifteen patients a day), for example, previously consisted of acute care referrals from Holmes RMC. As soon as Dr. Dowdell refused to participate in Health First's referral exclusive dealing arrangements, however, he stopped receiving such referrals. This included patients covered by plans other than Health First health plans.

63.     As another example, Holmes RSC revoked Dr. Craig Deligdish's hospital privileges in 2010, without cause or justification, in response to his voicing his concerns as to Health First's exclusionary referral practices. (Holmes RMC had previously celebrated Dr. Deligdish with an award for being the "Doctor with the Biggest Heart.")

64.     Health First hospitals continue to refuse to refer patients to physicians who do not participate in Health First's exclusive-dealing arrangements and to deny privileges to those hospitals.

### *Coercive Threats in Aid of Referral Exclusive Dealing and Group Boycott*

65.     Health First has also used threats to maintain its monopoly over acute care services. Michael Means served as Chief Executive Officer and President of Health First Inc. from 1995 to December 2011 and was President and Chief Executive Officer of Holmes RMC and Palm Bay Hospital beginning in 1989.

66.     Means reportedly instructed the CEO of Wuesthoff-Melbourne to "stay out of South [Brevard] County." He reportedly told the physicians at a Medical Staff meeting at Holmes RMC: "If you sign letters of support for Wuesthoff, we will know who you are."

67.     Such threats amount to the organization of a group boycott against competing hospitals or potential entrants by physicians currently affiliated with Health First. Again, because Health First controls must-have hospitals in the relevant markets, physicians are generally unable to resist Health First terms of dealing that prevent them from doing business with competing hospitals.

### *Coercive Retaliation in Aid of Referral Exclusive Dealing and Group Boycott*

68.     Wuesthoff-Melbourne opened in SBC in 2002 after Health First had lost a hard-fought battle to prevent its market entry. Wuesthoff is smaller than

Holmes RMC, but nonetheless has 115 private rooms and offers a wide range of services (including interventional cardiac care, full-service emergency department, surgery suites, family birth place, diagnostic and rehabilitation services) and ancillary services (including reference laboratory, homecare, nursing facility, assisted living facility, hospice, home medical equipment, wound care and hyperbaric center).

69.     Despite repeated requests from Health First, OMNI refused to agree to admit its patients exclusively to Health First's hospitals. In response, Health First threatened to retaliate by recruiting physicians to compete with OMNI and to offer them higher rates and compensation.

70.     Health First made good on its threats, eventually hiring both additional primary care physicians and specialists. Health First further retaliated by, among other things, transferring OMNI's HR Health Plans patients to its own physicians, terminating a contractual program whereby OMNI provided unassigned call coverage at Health First's Palm Bay Hospital, and commissioning chart audits on OMNI's physicians.

71.     Health First also cancelled OMNI's self-funded health-insurance plan covering its 500+ employees and dependents, which had been contractually administered by HF Health Plans. Health First further refused to provide OMNI with

its claims experience file so that OMNI could obtain alternate health insurance for its employees and their dependents.

72.    Health First also retaliated against OMNI in other ways, including:

a.    Terminating OMNI's pharmacy contract as a provider in Health First's Medicare Part D Plan, despite the fact that it met the plan's terms and conditions for participation;

b.    Fabricating a $1 million alleged overpayment for fees and services rendered over a two-year period by OMNI;

c.    Refusing to reimburse for digital mammograms provided by OMNI and requiring its patients to receive preauthorization for digital mammography on the false grounds that the technology was unproven, that is until several months later when Health First was able to purchase its own digital mammography equipment, after which it struck the requirement for preauthorization;

d.    Initiating a sham audit of OMNI and requesting more than 1,000 of OMNI's charts; and

e.    Failing to compensate OMNI physicians at the same rate that they compensated other physicians, and litigating this payment issue with OMNI through binding arbitration.

73.     In 2017, Health First refused to re-credential OMNI's physicians at its monopoly hospitals and terminated OMNI's participation in HF Health Plans. For several years after terminating OMNI, Health First encouraged OMNI's physicians to leave OMNI by promising the physicians that, if they left OMNI and joined another physician group (namely, a group that admitted patients exclusively to Health First's hospitals and referred patients exclusively to Health First's physician and ancillary service providers), they would be permitted to participate in HF Health Plans. In addition, physicians who left OMNI for other physician groups were allowed to participate in Health First's health plans only if they agreed not to refer any patients to OMNI.

74.     Health First not only refused to deal with OMNI but refused to deal with those physicians who dealt with OMNI to induce a boycott of OMNI.

75.     Health First's referral exclusive-dealing arrangements and boycott are indefinite in duration. Physicians are not free to terminate them unless they wish to also be boycotted by Health First health plans, excluded from using monopolized acute care facilities operated by Health First, and excluded from patient referrals from Health First physicians and Health First's cooperating, boycotting independent physician groups.

76.     Health First and the doctors agreeing to exclusive-dealing arrangements and boycotts collectively control a dominant share of all patient admissions and

referrals in BC (and SBC). They determine where their patients receive medical treatment and to which specialists they are referred. Health First's referral exclusive-dealing arrangements have thus unreasonably deprived competitive hospitals of a market for their goods and services

77.   As with other exclusionary conduct alleged herein, this anti-competitive conduct is ongoing.

### *MIMA Acquisition Strengthens Referral Exclusive Dealing*

78.   HF Physicians, including now the former-MIMA physicians, admit exclusively or near-exclusively to Health First medical facilities as a contractual and/or *de facto* condition of their employment. With the acquisition of MIMA it has thus been easier for Health First to monitor and police former MIMA physicians and ensure they abide by the terms of the exclusive dealing arrangements.

79.   Accordingly, the MIMA acquisition has helped Health First to perfect its control over the majority of admissions and specialty referrals in BC (and SBC), thus maintaining its acute care hospital monopoly, as well as restraining competition in the relevant physician services marke**t.**

### *Market Allocation Agreements*

80.   On information and belief, based on the observed course of dealing, Health First has also preserved its monopoly through anti-competitive market allocation agreements with Florida Hospital (now called AdventHealth).

21

81.     Florida Hospital has pervasive operations throughout central Florida, but not in BC (and SBC) where Health First is dominant. When three hospitals came up for sale within Health First's markets, Florida Hospital did not attempt to purchase them, even though it had been growing rapidly throughout the state.

82.     Instead, it appears that Health First and Florida Hospital have agreed to stay out of each other's markets, and to instead refer patients from their respective markets to each other. In aid of this market allocation, and facilitating anticompetitive cooperation, Health First has sold an estimated 30 percent of its stock to its co-conspirator Adventist HealthCare.

## CLASS INURY AND STANDING

83.     Over many years to the present, Health First has excluded competition in the acute care relevant market. As a consequence, its fees charged to acute care patients and health plans serving those patients are substantially higher than competitive levels and they all are suffering antitrust price injury.

84.     These high fees do not attract entry because Health First acts anticompetitively to prevent entry and competitive expansion through its exclusive dealing arrangements, its conduct in aid of those arrangements, and its market allocation agreements. In addition, plans and acute care patients are receiving quality of care well below competitive levels.

85.    Plaintiffs and the Classes have thus suffered injury of the type the antitrust laws were intended to prevent, flowing from that which makes Health First's acts unlawful.

86.    Plaintiffs and the Classes allege that Health First's anticompetitive conduct has caused them to pay supra-competitive prices in the relevant market. Such an injury is plainly of the type the antitrust laws were intended to prevent.

87.    Health First's misconduct has directly caused this injury to Plaintiffs and the Classes. Plaintiffs and the Classes are naturally motivated to enforce the antitrust laws because they had and have the natural economic self-interest in paying reasonable rather than supra-competitive prices.

88.    Whereas physician competitors of Health First, as noted, have pursued antitrust claims against Health First for its harm to competition in the relevant market, that lawsuit did not seek to recover and did not recover for the injuries to the members of the Classes, and denying a remedy to Plaintiffs and the Classes would be likely to leave a significant antitrust violation undetected or unremedied.

89.    Any overlaps in the facts and issues between this action and the action that physician competitors brought against Health First, and the settlement that they reached with Health First, did not concern the calculation of damages at issue in this action, which calculation involves conceptually and categorically different measures that pose no threat of duplicative recoveries.

## CLASS ALLEGATIONS

### Acute Care Damage Class

### Federal Rule of Civil Procedure 23(a) Prerequisites

90.     Plaintiffs Skipper and Baker represent a class of patients and health plans using Health First acute care seeking relief for their direct payments to Health First for acute care on or after April 19, 2017. For patients such payments are defined as their co-insurance payments computed as percentages of Health First acute care fees and not limited by health plan annual, out-of-pocket maximums or otherwise. Excluded from this class are (a) patient payments which are set at a fixed amounts by insurance plan or otherwise regardless of the cost of the procedure, including co-payments; (b) patients paying insurance deductibles to Health First; (c) persons employed by Health First, Inc. and its subsidiaries; (d) HF and Adventist HealthCare health plans; and (e) the Presiding Judge, employees of this Court, and any appellate judges exercising jurisdiction over these claims as well as employees of that appellate court.

91.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

a.     The number of persons in the Class is in the thousands and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder is also

24

impracticable because of the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

b.     There are numerous questions of law and fact arising from the pattern of monopolization and restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether Health First has market power; (2) whether it has monopolized and restrained trade in the acute care relevant market; and (3) whether this conduct, taken as a whole, has materially caused antitrust price injury on members of the Class.

c.     The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action and supra-competitive pricing.

d.     The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class

Representatives and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representatives and the other members of the Class.

### Federal Rule of Civil Procedure 23(b)(3) Prerequisites

92.     Prosecution of the damage claims of the Class is appropriate pursuant to Rule 23(b)(3) because:

a.     Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

b.     A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Acute Care Injunctive Class

### Federal Rule of Civil Procedure 23(a) Prerequisites

93.     Plaintiffs represent a class of acute care patients and health plans using Health First acute care seeking injunctive relief from Health First's exclusionary and anticompetitive conduct. Excluded from the class are (a) persons employed by Health First, Inc. and its subsidiaries; (b) HF and Adventist HealthCare health plans; and (c) the Presiding Judge, employees of this Court, and any appellate judges exercising jurisdiction over these claims as well as employees of that appellate court.

26

94.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

a.    The number of persons in the Class is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the need to expedite judicial relief and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

b.    There are numerous questions of law and fact arising from the pattern of monopolization and restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether Health First has market power; (2) whether it has monopolized and restrained trade in the acute care relevant market; (3) whether this conduct, taken as a whole, threatens quality of care and future above-competitive pricing; and (4) the nature and extent of the injunctive relief available to the members of the Class.

c.    The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of

27

the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action and supra-competitive pricing.

d.     The Class Representatives and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representatives and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representatives and the other members of the Class.

**Federal Rule of Civil Procedure 23(b)(2) Prerequisites**

95.     The prosecution of the claims of the Class pursuant to Rule 23(b)(2) is appropriate because Health First has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

**<u>CAUSES OF ACTION</u>**

**FIRST CLAIM FOR RELIEF**

**Monopolization of the Acute Care Market
in Violation of Section 2 of the Sherman Act**

96.     Plaintiffs incorporate the allegations above.

97.    Health First and its controlled subsidiaries, including its hospitals, health plans, and physicians, have monopolized the relevant market for the sale of acute care hospital services.

98.    Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as its agencies or instrumentalities.

99.    Health First has market power in the relevant market and has willfully maintained that power over a number of years.

100.    Competition in the relevant market has been harmed and the acute care fees paid to Health First by health plans are higher than competitive levels.

101.    In addition, patients have received quality of care far below competitive standards.

102.    Health plans have thus suffered antitrust injury caused by the exclusionary conduct when paying Health First directly for care and therefore have been injured in their business and property.

103.    Health First's continuing exclusionary conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

## SECOND CLAIM FOR RELIEF

### Agreements in Restraint of Trade in
### Violation of Section 1 of the Sherman Act

104.    Plaintiffs incorporate the allegations above.

105.    Various physicians, individuals, firms, and corporations, not named as defendants herein, have participated as co-conspirators with Defendant and performed acts and made statements in furtherance of the conspiracy, including its exclusive dealing, boycotting and market allocation.

106.    By entering into exclusive-dealing agreements with physicians, and by organizing a group boycott of competing hospitals, Health First has entered into agreements that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### THIRD CLAIM FOR RELIEF

### Violation of the Florida Antitrust Act

107.    Plaintiffs incorporate the allegations above.

108.    Health First's anticompetitive conduct violates the Florida Antitrust Act, Fl. Stat. §§ 542.15-542.36.

109.    Health First's agreements with physicians and organization of a group boycott violate Fl. Stat. § 542.18, which prohibits "[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state."

110.    Health First's monopolization of the acute care hospital services market violates Fl. Stat. § 542.19, which makes it "unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state."

111.    Plaintiff and the other class members have been injured in their "business or property" by these violations, as required by Fl. Stat. § 542.22.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

A.    Declare that Health First's conduct violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, allowing treble damage relief to the Acute Care Damage Class under Section 4 of the Clayton Act, 15 U.S.C. § 15.

B.    Permanently enjoin Health First from continuing its unlawful actions under Section 16 of the Clayton Act, 15 U.S.C. § 26, and remedying unlawful market power to enable vigorous actual or potential competition.

C.    Declare that Health First's conduct violates the Florida Antitrust Act, Fl. Stat. §§ 542.18-542.19, allowing treble damage relief to the proposed Classes under Fl. Stat. § 542.22(1).

D.    Permanently enjoin Health First from continuing their unlawful actions under Fl. Stat. § 542.23.

E.    Award reasonable attorneys' fees and costs as allowed by law;

F.    Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

G.    Grant such other and further relief as the Court deems just and equitable.

31

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury.

Date: April 19, 2021                                  BY: <u>/s/ *Ronald G. Meyer*</u>

Trial Counsel
Ronald G. Meyer
Florida Bar Number 0148248
Meyer and Blohm, P.A.
Post Office Box 1547
Tallahassee, FL  32302
rmeyer@meyerblohmlaw.com
Telephone: (850) 878-5212

Trial Counsel
R. Stephen Berry*
Berry Law PLLC
1100 Connecticut Avenue NW
Suite 645
Washington, DC 20036
Telephone: (202) 296-3020
FAX: (202) 296-3036
sberry@berrylawpllc.com

*Pro Hac Vice Pending

*Attorneys for Plaintiffs*