## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |
|---|---|
| ANTHONY COLUCCI, VANESSA LORRAINE SKIPPER, Individually and on Behalf of Those Similarly Situated,<br><br>                                    Plaintiffs,<br><br>          v.<br><br>HEALTH FIRST, INC.,<br><br>                                    Defendant. | **No. 6:21-cv-00681-RBD-GJK**<br><br>**JURY DEMANDED**<br><br>**DAMAGES AND INJUNCTIVE RELIEF SOUGHT** |

## SECOND AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

PARTIES.....................................................................................................2

JURISDICTION AND VENUE .....................................................................3

INTERSTATE TRADE AND COMMERCE....................................................4

DEFINITIONS OF RELEVANT MARKET ....................................................5

   Product Market for the Sale of Inpatient and Emergency Room Acute Care..........5

   Geographic Market: BC or SBC ...............................................................6

DEFENDANT'S MARKET POWER ..............................................................8

MONOPOLIZATION....................................................................................9

   Exclusionary Leverage of Health First Control Over Health Plans.....................11

   Exclusionary Physician Financial Inducements and Preferential Treatment........14

   Exclusionary Revocation of Physician Hospital Privileges ...............................15

   Exclusionary Coercive Threats................................................................16

   Exclusionary Coercive Retaliation Against Physicians.....................................16

   Exclusionary MIMA Acquisition.............................................................20

MARKET DIVISION TO RESTRAIN INPATIENT COMPETITION ..............20

   Direct Evidence of Collusive Agreement Patently Inconsistent With
Independent Conduct ..............................................................................22

   Multiple Circumstantial Factors Also Make Independwent Conduct Unlikely ...24

   Powerful Collusive Motive .....................................................................24

   Collusive Communication at the Highest Level............................................25

   Market Structure Encouraging Adventist's Collusive Avoidance of Barriers
to Entry in BC ......................................................................................25

   Market Structure Encouraging Adventist's Purchase of a Substantial Collusive
Stake in Health First to Make Easier Increases in Prices in Both Systems
and the Enforcement of the Market Division...............................................25

ADVENTIST'S PARTIAL OWNERSHIP IN RESTRAINT OF TRADE ...........29

EXCLUSIVE DEALING ............................................................................29

CLASS INJURY AND STANDING ............................................................31

CLASS ALLEGATIONS ...........................................................................32

   Damage Class for Inpatient and Emergency Room Acute Care.........................32

   Federal Rule of Civil Procedure 23(a) Prerequisites......................................32

   Federal Rule of Civil Procedure 23(b)(3) Prerequisites .................................34

   Injunctive Class for Inpatient and Emergency Room Acute Care ......................34

Federal Rule of Civil Procedure 23(a) Prerequisites............................................34

Federal Rule of Civil Procedure 23(b)(2) Prerequisites .........................................36

CAUSES OF ACTION.........................................................................................37

FIRST CAUSE OF ACTION ...............................................................................37

Monopolization of the BC Acute Care Relevant Market in Violation of Section 2
of the Sherman Act ...........................................................................................37

SECOND CAUSE OF ACTION ...........................................................................39

Horizontal Market Division in Restraint of Trade in Violation of Section 1 of
the Sherman Act ...............................................................................................39

THIRD CAUSE OF ACTION................................................................................41

Restraining Competition Via Sale of Partial Ownership in Violation
of  Section 7 of the Clayton Act.........................................................................41

FOURTH CAUSE OF ACTION ...........................................................................43

Exclusive Dealing in Restraint of Trade in Violation of Section 1
of the Sherman Act...........................................................................................43

FIFTH CAUSE OF ACTION.................................................................................45

Violation of Section Fl. Stat. § 542.19 of the Florida Antitrust Act.....................45

JURY DEMAND .................................................................................................46

On behalf of themselves and those similarly situated, Anthony Colucci and Vanessa Lorraine Skipper ("Plaintiffs") bring this action against Health First, Inc. ("Health First" or "Defendant") and allege as follows:

## INTRODUCTION

1.      This case arises from the pervasive and long-term exclusionary misconduct that Health First has committed in the market for acute care and that this Court has already scrutinized. In *Omni Healthcare Inc. v. Health First*, No. 6:13-cv-1509-Orl-37DAB (filed Sept. 27, 2013) (Dalton, J.), physician competitors of Health First sought to recover profits lost due to Health First's anticompetitive conduct. After one day of trial, on August 16, 2016, Health First agreed to settle and the case was voluntarily dismissed. (ECF No. 329.)

2.      Unfortunately, Health First was unchastened. After the *Omni Healthcare* settlement, Health First continued its efforts to maintain and strengthen a monopoly in the market for acute care, and restrained trade, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Section 7 of the Clayton Act, 15 U.S.C. 18. Health First achieves these anticompetitive ends through exclusionary acts suppressing and injuring competition in the Brevard County relevant market for the sale of inpatient and emergency room acute care, including in part acquiring the largest competing physician group, Melbourne Internal Medical Associates; leveraging its market power in adjacent markets into the acute care market; pervasive and highly effective exclusionary conduct in hospital referrals; and conspiring with

AdventistHealth ("Adventist") to protect its entrenched monopoly in the relevant market from competition, and otherwise restrain trade.

3.      Health First's monopolization and restraint of trade foreclose competition from both rival acute care hospitals in Brevard County or Southern Brevard County ("BC" and "SBC," respectively) and from potential market entrants, such as AdventistHealth ("Adventist"), since all need access to physicians and their referrals, as well as health plan patients, to compete effectively in the acute care relevant market. Defendant has caused its competitors harm in the form of lost profits; at the same time, it has caused the health plans and acute care patients who pay its bills harm in the form of overcharges for services, well above the fees that they would pay in a competitive market.

4.      On behalf of themselves and similarly situated acute care patients and health plans, Plaintiffs seek damages for Health First's above-competitive fees charged in the BC or SBC relevant market for the sale of inpatient and emergency room acute care (the "acute care relevant market"). Plaintiffs also seek injunctive relief to bring Health First's long history of exclusionary conduct to an end.

**PARTIES**

5.      Plaintiff Anthony Colucci resides at 5644 Reagan Avenue, Titusville, FL 32780. Mr. Colucci is the President of the Brevard Federation of Teachers, 1007 South Florida Avenue, Rockledge, FL 32955. Mr. Colucci previously served as its Vice President and, prior to accepting this position, he was employed as a teacher for 16 years in Brevard County. Over the last several years his family has used acute care

services provided by Health First and made substantial co-insurance payments to Health First for this care.

6.      Plaintiff Vanessa Lorraine Skipper resides at 1847 Abbeyridge Drive, Merritt Island, FL 32953. Ms. Skipper has served as Vice President of the Brevard Federation of Teachers, 1007 South Florida Avenue, Rockledge, FL 32955, since 2018. Prior to assuming this position, she was employed as an English teacher at Cocoa High School, Cocoa, FL. In the last several years she has used acute care services provided by Health First and made substantial co-insurance payments to Health First for this care.

7.      Health First is a not-for-profit corporation organized and existing since 1995 under Florida law, with its principal place of business in SBC. Health First Inc. is the parent corporation of four affiliated hospitals located in BC: Holmes Regional Medical Center, Cape Canaveral Hospital Inc., Palm Bay Hospital, and Viera Hospital, Inc. Health First is also the parent corporation of subsidiaries that manage physician groups ("HF Physicians") and administer health plans ("HF Health Plans"). Health First bills itself as "Central Florida's only fully integrated health system."

## JURISDICTION AND VENUE

8.      This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Plaintiffs seek statutory damages and injunctive relief from ongoing violations of the antitrust laws of the United States, specifically, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

10.     This Court has personal jurisdiction over Health First because it resides in this District; transacts business in this District; and commits overt acts in furtherance of the illegal scheme and conspiracy alleged herein in this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because Health First has resided, transacted business, has been found, and has agents in this District; most or all of the events giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce at issue has been carried out in this District.

12.     Pursuant to 28 U.S.C. § 1367(a) this Court has supplemental subject matter jurisdiction over the monopolization claim under the Florida Antitrust Statute.

## INTERSTATE TRADE AND COMMERCE

13.     The conduct of Health First, and unnamed physicians and health plans acceding to Health First exclusionary conduct, have been within the flow of and substantially affected interstate commerce.

14.     During the relevant period, a large percentage of Health First's revenues have come from sources located outside of Florida, including the federal government (through the Medicare and Medicaid programs).

15.     Health First purchases a substantial portion of its medicine and supplies from sellers located outside of Florida.

4

16.     Many employers that have made payments to Health First (either directly or through health insurers) sell products or services in interstate commerce.

## DEFINITIONS OF RELEVANT MARKET

### Product Market for the Sale of Inpatient and Emergency Room Acute Care

17.     The relevant product market with respect to Health First's misconduct encompasses the sale of inpatient and emergency room acute care. These are short-term health-care treatments that patients receive at a hospital to address an acute, trauma or urgent need. They may or may not require admission for overnight stays at the hospital.

18.     There are essentially no substitutes for these acute care inpatient and emergency room services provided in hospital facilities, and consumer demand for these services is generally inelastic because such services are often necessary to prevent death or long-term harm to health. As a result, there is extremely low cross-elasticity of demand between these acute care services and outpatient services not requiring use of hospital services.

19.     In addition, the choice of these hospital acute care services is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.

20.     Accordingly, a monopolist can impose a small but significant price increase in the pricing of inpatient and emergency room acute care in the relevant

market without causing patients to switch to outpatient services or other health care options.

## Geographic Market: BC or SBC

21.    The relevant geographic market for the sale of acute care services with respect to Health First's misconduct is BC or SBC.

22.    The hospital facilities located in BC would have the economic power, if acting collectively, to increase prices for the relevant acute care services above competitive levels.

23.    The outflow rate (those BC residents who receive the relevant acute care services at hospitals outside of BC) is low and has not varied significantly year-to-year, despite Health First's above-competitive prices. The inflow rate (those residents outside of BC who receive inpatient and emergency room acute care inside BC) is also low and has not varied significantly year-to-year despite changes in relative prices.

24.    The low outflow and inflow rates for these acute care services support the conclusion that acute care hospitals located outside of BC do not provide sufficient competitive discipline to those within BC to warrant their inclusion in the relevant geographic market. There is extremely low cross-elasticity of demand between acute care hospitals located inside and outside of BC.

25.    Only physicians can admit patients to hospitals, and there is little overlap between the physicians who admit to acute care hospitals located within BC and those who admit to hospitals outside of BC.

26.     Acute care hospitals located within BC offer prices to managed care plans without regard to prices charged to those plans by non-affiliated acute care hospitals located outside BC.

27.     Acute care hospitals located outside BC offer prices to managed care plans without regard to prices charged to those plans by non-affiliated acute care hospitals located within BC.

28.     Managed-care plans cannot substitute acute care hospitals, or physicians, located outside BC for hospitals and physicians located within that area.

29.     Patients located within BC typically do not utilize acute care hospitals, or physicians, located outside BC for acute care hospital or physician services available within BC.

30.     Hospitals located within BC have the ability to raise prices at least 5 percent higher than the prices that would prevail in a competitive market without losing enough volume to make this price increase unprofitable.

31.     In the alternative, if BC is not a discrete regional market for acute care hospital services, the allegations in paragraphs 17-30 apply with equal or greater force to SBC, a geographic area within BC.

32.     Indeed, Defendant itself has argued that SBC is a separate geographic market for antitrust purposes. This assertion was made in a 1995 Submission to the Federal Trade Commission ("FTC") in support of the then-proposed affiliation of Cape Canaveral Hospital and Holmes RMC. In that submission, Health First argued

that the combination of the two facilities would not reduce competition because the two hospitals were in different geographic markets. Health First's argument to the FTC was successful and, as a consequence, the FTC elected not to challenge the transaction. There has been no material difference between hospital usage patterns over time.

33.     In addition, in a Certificate of Need Application submitted in 2004, Holmes RMC identified "South Brevard" as a "natural market area."

### DEFENDANT'S MARKET POWER

34.     In 2014, Health First had an 86.8 percent share of the relevant market in SBC (as measured by patient admissions). This market share has increased in subsequent years. Health First's share of the same product market in the broader BC market is currently estimated at greater than 90 percent.

35.     Health First's market power in both of the geographic markets is also demonstrated by (1) its ability to exclude rival providers of the relevant acute care services; and (2) its ability to raise prices to patients and health plans well above competitive levels.

36.     Barriers to entry in the relevant market in BC or SBC make new entry difficult, costly, unlikely, and untimely. Building an acute care hospital is expensive and time-consuming.

37.     With the sole exception of Wuesthoff Medical Center, Melbourne ("Wuesthoff-Melbourne"), for example, no new competitive hospital has built an

acute care hospital in SBC in at least 15 years, despite prices well above competitive levels that would attract entry in a competitive relevant market.

## MONOPOLIZATION

38.     Health First was formed in 1995 by the joining of Holmes Regional Medical Center ("Holmes RMC") and Palm Bay Hospital (located in SBC) and Cape Canaveral Hospital (located in Central Brevard County). Health First was at this time the sole provider in SBC because it controlled the only two acute care hospitals in the county. The only acute care hospital competitor to enter the relevant market since that time has been Wuesthoff-Melbourne in 2002.

39.     Health First has unlawfully maintained its monopoly and restrained trade by using its existing leverage over physicians, as well as health plans, in order to minimize the possibility of referrals to other acute care hospitals.

40.     Physicians practicing in relevant specialties in these geographic markets are dependent on Health First in multiple respects, including because the Health First health plans provide them with patients and the Health First hospitals provide them with facilities and admitting privileges.

41.     As a result, physicians are at the mercy of Health First's enormous market power. Referrals from such physicians are in turn necessary for any hospital to compete with Health First's established facilities.

42.     Accordingly, Health First can substantially foreclose competition and maintain and strengthen its monopoly by preventing physicians and health plans from

referring to other hospitals. The exclusionary conduct that Health First continues to employ to maintain its market power in the relevant market for the sale of inpatient and emergency room acute care services, including creating competitive barriers to entry or expansion, include:

a. leveraging of its market power over health plans to induce referrals of acute care patients to Health First hospitals;

b. using strong financial inducements to independent physicians to induce referrals of acute care patients to Health First hospitals;

c. actual or threatened revocation of physician hospital privileges to induce referrals of acute care patients to Health First hospitals;

d. coercive threats to physicians to induce referrals of acute care patients to Health First hospitals;

e. retaliation against physicians to induce referrals of acute care patients to Health First hospitals;

f. the acquisition of the independent physician group Melbourne International Medical Associates ("MIMA") to induce referrals of acute care patients to Health First hospitals;

g. a conspiracy to restrain trade by unlawful market division with Adventist; and maintain Health First's monopoly in the BC relevant market; and

h. Health First's sale of a substantial ownership interest to Adventist allowing both systems to more easily raise inpatient and

10

emergency room prices and more easily enforce unlawful market division.

43.    With the above conduct Health First's willful maintenance of its market power over the relevant market has excluded actual or potential competing hospitals within the market, injuring competition and materially causing antitrust price injury to members of the proposed Classes.

**Exclusionary Leverage of Health First
Control Over Health Plans**

44.    Health First vertically integrated into the market for physician services and the market for the sale of health-insurance plans in SBC. In 1995, it formed its own physician group, HF Physicians. In 1996, it created HF Health Plans to offer HMO plans in BC.

45.    Health First has long recognized its market power in the relevant market. When the head of the Central Brevard Health Care Coalition urged Michael Means, then President of Health First, to improve its health information system, he responded that he was not compelled to because "he was a monopolist."

46.    Holmes RMC (formerly known as Brevard Hospital) opened in 1937 and is the largest hospital in BC. It is also the only hospital in SBC with a Level II Trauma Center, Level II Neonatal Intensive Care Unit, and air ambulance (First Flight helicopter).

47.    Due to its size and unique offerings, Holmes RMC is considered what healthcare experts refer to as a "must-have" hospital. In other words, any health plans

that intend to market their products in BC have little choice but to include Holmes RMC in their networks. Wuesthoff-Melbourne, one of two of Health First's only hospital competitors in SBC, is too small to provide the same range of services that Holmes RMC provides. As a result, it provides only limited competition.

48.     Once Health First secured its dominance over acute care in BC, it acted to maintain and strengthen this dominance.

49.     First, Health First leveraged its market power in the relevant acute care market into the adjacent market for the sale of private health insurance sold by HF Health Plans by exploiting Holmes RMC's "must have" status to require competing private health plans to include *all* Health First hospitals in their network as a precondition for including Holmes RMC. Accordingly, all health plans have been purchasing acute care services on behalf of their enrollees from the heavily-dominant Health First hospitals in BC (and SBC), making it less likely they would be sent to Health First's hospital competitors.

50.     Second, HF Health Plans has achieved a dominant share in this market for the sale of private health plans in BC (and SBC) and it has used that dominance to strengthen Health First's existing market power. HF Health Plans covers more insured patients than any other private health plan in the relevant geographic markets. And Health First has assiduously leveraged this power into the physician services relevant market by denying competing independent physicians access to patients enrolled in HF Plans unless they make patient referrals exclusively to Health First's hospital

12

monopoly (and to HF Physicians) thereby suppressing actual or potential acute care competition. Health First's hospital competitors need such referrals to compete effectively and at the necessary scale.

51.     As an example, Jerry Senne was the President and Chief Executive Officer at Holmes RMC, and the founding President and Chief Executive Officer of HF Health Plans. He informed OMNI Healthcare, Inc. ("OMNI") that it could participate in the network for HF Health Plans only if it agreed to admit its patients exclusively to Health First's hospitals.

52.     In March 2004, Senne met with OMNI physician Dr. Seminer and offered to allow OMNI to remain a participating member of HF Health Plans in exchange for an agreement by OMNI to admit its patients exclusively to Health First's hospitals.

53.     Ultimately, after repeated attempts to coerce OMNI into admitting exclusively to Health First's hospitals, Health First refused to renew OMNI's contract with HF Health Plans. Instead, it demanded that OMNI's physicians contract individually with HF Health Plans as opposed to contracting as a group.

54.     This has the effect of inducing competing, independent physicians to stop competing with Health First physicians by either joining HF Physicians (and therefore referring patients only to Health First hospitals) or joining nominally "independent" groups cooperating with Health First by entering into either explicit or implied

exclusive dealing arrangements that refer all patients to Health First hospitals. Health First thus uses its health plans to strengthen its market power in the relevant market.

55.     Health First's effective power to exclude and exclusionary conduct is demonstrated by the fact that physicians who participate in HF Health Plans send only 15 percent of their *non*-HF Health Plans patients (whom they could send anywhere) to Wuesthoff-Melbourne. In contrast, physicians who do not participate in HF Health Plans utilize Wuesthoff-Melbourne 45 percent of the time.

## Exclusionary Physician Financial Inducements and Preferential Treatment

56.     Health First had *de facto* exclusive dealing arrangements with MIMA before its acquisition, in aid of referral of acute care patients to its hospitals. Health First induced MIMA's physicians into admitting exclusively or nearly exclusively to Health First hospitals by offering financial inducements and preferential treatment. One inducement was to grant MIMA the right to provide radiation-therapy services to Health First's members, with Health First shutting down its competing radiation-therapy department and selling its equipment to MIMA. That radiation oncology program became the most profitable of all of MIMA's ancillary services.

57.     Prior to its acquisition by Health First, MIMA had over 100 doctors and 10,000 hospital admissions a year. Only one percent of those admissions occurred at Wuesthoff-Melbourne. It has offices within the range of one to three miles from Wuesthoff-Melbourne and has moved its building and main headquarters closer to Wuesthoff-Melbourne.  Yet it still does not utilize Wuesthoff-Melbourne.

14

58.    Health First continues to provide financial inducements to providers to maintain anti-competitive exclusionary arrangements and prevent hospital competitors from gaining share in the relevant markets. As with MIMA, these inducements involve agreements not to compete in certain specialties or areas of care.

**Exclusionary Revocation of Physician
Hospital Privileges**

59.    Health First has also coerced referral of acute care patient to its hospitals by independent physicians by revoking or threatening to revoke their patient referrals *from* its hospitals to these physicians, as well as revoking their hospital privileges.

60.    Without hospital privileges, a physician cannot perform services at a Health First hospital. Of course, such revocations or threats of revocations are particularly powerful exclusionary tools due to Health First's acute care monopoly in BC (and SBC) and Holmes RMC's status as a "must have" hospital in the geographic market.

61.    A substantial portion of Dr. Brian Dowdell's practice (as many as ten to fifteen patients a day), for example, previously consisted of acute care referrals from Holmes RMC. As soon as Dr. Dowdell refused to participate in Health First's referral exclusive dealing arrangements, however, he stopped receiving such referrals. This included patients covered by plans other than Health First health plans.

62.    As another example, Holmes RSC revoked Dr. Craig Deligdish's hospital privileges in 2010, without cause or justification, in response to his voicing his concerns as to Health First's exclusionary referral practices. (Holmes RMC had

previously celebrated Dr. Deligdish with an award for being the "Doctor with the Biggest Heart.")

63.    Health First hospitals continue to refuse to refer patients to physicians who do not participate in Health First's exclusive-dealing arrangements and to deny privileges to those hospitals.

**Exclusionary Coercive Threats**

64.    Health First has also used threats toward physicians affiliated with Health First to maintain its monopoly over acute care services by inducing referral of acute care patients to its hospitals. Michael Means served as Chief Executive Officer and President of Health First Inc. from 1995 to December 2011 and was President and Chief Executive Officer of Holmes RMC and Palm Bay Hospital beginning in 1989.

65.    Means reportedly instructed the CEO of Wuesthoff-Melbourne to "stay out of South [Brevard] County." He reportedly told the physicians at a Medical Staff meeting at Holmes RMC: "If you sign letters of support for Wuesthoff, we will know who you are."

66.    Because Health First controls must-have hospitals in the relevant market, physicians are generally unable to resist Health First terms of dealing that prevent them from doing business with competing hospitals.

**Exclusionary Coercive Retaliation
Against Physicians**

67.    Wuesthoff-Melbourne opened in SBC in 2002 after Health First had lost a hard-fought battle to prevent its market entry. Wuesthoff is smaller than Holmes

RMC, but nonetheless has 115 private rooms and offers a wide range of services (including interventional cardiac care, full-service emergency department, surgery suites, family birth place, diagnostic and rehabilitation services) and ancillary services (including reference laboratory, homecare, nursing facility, assisted living facility, hospice, home medical equipment, wound care and hyperbaric center).

68.     Despite repeated requests from Health First, physician group OMNI refused to agree to admit its patients exclusively to Health First's hospitals. In response, Health First threatened to retaliate by recruiting physicians to compete with OMNI and to offer them higher rates and compensation.

69.     Health First made good on its threats, eventually hiring both additional primary care physicians and specialists. Health First further retaliated by, among other things, transferring OMNI's HR Health Plans patients to its own physicians, terminating a contractual program whereby OMNI provided unassigned call coverage at Health First's Palm Bay Hospital, and commissioning chart audits on OMNI's physicians.

70.     Health First also cancelled OMNI's self-funded health-insurance plan covering its 500+ employees and dependents, which had been contractually administered by HF Health Plans. Health First further refused to provide OMNI with its claims experience file so that OMNI could obtain alternate health insurance for its employees and their dependents.

71.     Health First also retaliated against OMNI in other ways, including:

17

a.    Terminating OMNI's pharmacy contract as a provider in Health First's Medicare Part D Plan, despite the fact that it met the plan's terms and conditions for participation;

b.    Fabricating a $1 million alleged overpayment for fees and services rendered over a two-year period by OMNI;

c.    Refusing to reimburse for digital mammograms provided by OMNI and requiring its patients to receive preauthorization for digital mammography on the false grounds that the technology was unproven, that is until several months later when Health First was able to purchase its own digital mammography equipment, after which it struck the requirement for preauthorization;

d.    Initiating a sham audit of OMNI and requesting more than 1,000 of OMNI's charts; and

e.    Failing to compensate OMNI physicians at the same rate that they compensated other physicians, and litigating this payment issue with OMNI through binding arbitration.

72.    In 2017, Health First refused to re-credential OMNI's physicians at its monopoly hospitals and terminated OMNI's participation in HF Health Plans. For several years after terminating OMNI, Health First encouraged OMNI's physicians to leave OMNI by promising the physicians that, if they left OMNI and joined another physician group (namely, a group that admitted patients exclusively to Health First's hospitals and referred patients exclusively to Health First's physician and ancillary

service providers), they would be permitted to participate in HF Health Plans. In addition, physicians who left OMNI for other physician groups were allowed to participate in Health First's health plans only if they agreed not to refer any patients to OMNI.

73.     Health First not only refused to deal with OMNI but refused to deal with those physicians who dealt with OMNI.

74.     Health First's exclusionary referral practices are indefinite in duration and continue. Physicians are not free to terminate them unless they wish to also be boycotted by Health First health plans, excluded from using monopolized acute care facilities operated by Health First, and excluded from patient referrals from Health First physicians and Health First's cooperating independent physician groups.

75.     Health First and the doctors acceding to exclusionary referral arrangements collectively control a dominant share of all patient admissions and referrals in BC (and SBC). They determine where their patients receive medical treatment and to which specialists they are referred. Health First's referral arrangements have thus deprived competitive hospitals of a market for their acute care services.

76.     As with other exclusionary conduct alleged herein, this anti-competitive conduct is ongoing.

## Exclusionary MIMA Acquisition

77.     HF Physicians, including now the former-MIMA physicians, admit exclusively or near-exclusively to Health First medical facilities as a contractual and/or *de facto* condition of their employment. With the acquisition of MIMA it has thus been easier for Health First to monitor and police former MIMA physicians and ensure they abide by the terms of the exclusive dealing arrangements.

78.     Accordingly, the MIMA acquisition has helped Health First to perfect its control over the majority of admissions and specialty referrals in BC (and SBC), thus maintaining its acute care hospital monopoly.

## <u>MARKET DIVISION TO RESTRAIN<br>INPATIENT COMPETITION</u>

79.      Health First has colluded with Adventist to divide unlawfully between their health systems inpatients in the BC relevant market for the sale of inpatient and emergency room acute care, rather than compete independently to provide this care.

80.     At issue here is not independent or mere parallel conduct, but conspiratorial restraint of trade implemented under a 2019 written agreement. Further, consistent with this express, direct evidence of collusion, are multiple "plus" circumstantial factors indicating that collusion is more likely than independent conduct.

81.     All this specific, direct and circumstantial evidence more than plausibly points to a likely conscious commitment to an unlawful market division and collusion protecting Health First's entrenched monopoly in the BC relevant market.

82.     Adventist is the prime actual potential competitor of Health First in BC. It has the vast resources to construct or purchase hospitals in the County capable of competitively bidding down the Health First's monopoly pricing paid by plans and patients in the relevant market.

83.     Entering the BC relevant market independently would have been consistent with Adventist's aggressive expansion over the last several years to a 16 hospital, central-Florida hospital system operating in and around Orlando, Florida.[1]

84.     Instead, Health First has made it more than worth Adventist's while to join a conspiracy dividing the BC relevant market. It has ceded Adventist a substantial, increasing ownership share (and effectively a comparable share in Health First's long-term, monopoly profits). In return, Adventist protects Health First's entrenched monopoly by not entering the market independently.

85.     By joining the conspiracy Adventist also avoids, if it were to enter the market independently, the necessity of overcoming the formidable barriers to such entry in part created by Health First over several years (by manipulating physician hospital referrals and otherwise).  *Supra* ¶¶ 34-37, 44-78.

86.     Also, Adventist gains the care of inpatients in Brevard County, and both health systems gain the ability to raise inpatient pricing. *Infra* ¶¶ 99-110.

---

[1] *See* Health First, Inc., *Health First, AdventHealth Expanded PartnershipOfficially Begins,* https://hf.org/news_and_events/adventhealth.cfm, June 19, 2019 (accessed July 7, 2021)

**Direct Evidence of Collusive Agreement Patently
Inconsistent With Independent Conduct**

87.     In June of 2019 Health First and Adventist entered into a written collusive agreement ("2019 Agreement") pervasively dividing between their health systems inpatients in the BC relevant market. They created a "super regional system of care," including in part the monopolized relevant market, with which Adventist "expanded [its] partnership" with Health First and "aligned [their] resources" [2] in return for a 30 percent stake in Health First (and effectively a substantial share of its monopoly profits). Adventist was also rewarded with two seats on the Health First Board of Directors facilitating the implementation of the market division.[3]

88.     To effectuate this collusive *quid pro quo,* Health First and Adventist formed under the 2019 Agreement an "Integrated Delivery Network"[4] dividing in part inpatient care in the BC relevant market between the two systems.

89.     Using the Network, they have proceeded to divide inpatient care in BC between their systems for pathology, orthopedic care and a variety of other inpatient treatments. By way of example, large numbers of orthopedic inpatients resident in BC have been forced to travel to Adventist hospitals outside BC even though their care could be provided more conveniently by closer Health First hospitals

90.     Health First and Adventist have also used the administration by HF

---

[2] *See id.*

[3] *See* https://www.modernhealthcare.com/mergers-acquisitions/adventhealth-buying-25-stake-health-first

[4] Note 1 *supra*.

22

Health Plans of Adventist's Medicare Advantage plans [5] to promote market division under the 2019 Agreement. Health First assigns BC inpatients to the two health systems as the administrator of both their health plans.

91.     By way of example, orthopedic surgeons caring for patients ensured by HF Health Plans on occasion need additional, higher level of care, *e.g.*, tumor removal. When they have requested authorization from the Plans to use specialty practices at the Mayo Clinic, University of Florida, etc., Health First has only allowed use of Adventist, which the surgeons have not requested or found as adequate for the patients' needs.

92.     Adventist has also declined to consider the purchase of assets in BC, apparently deferring to conspirator Health First. The Parish Cancer Center in Titusville, Florida is operated by OMNI, until recently under a license from Parrish Medical Center. OMNI is now attempting to sell the practice. Orlando Health, the Mayo Clinic, Cleveland Clinic, Genesis Care and Alliance have all expressed interest. OMNI also offered the sale to Adventist, but ***not*** Health First. Adventist was the only health system approached that failed to respond. Instead, out of the blue, Health First then appeared to express interest.

---

[5] *See* https://hf.org/ahap/contact_us.cfm

93.     A few months after the 2019 Agreement, Health First also executed a letter of intent with Adventist to "collaborate" to provide urgent care throughout BC.[6]

**Multiple Circumstantial Factors Also Make
Independent Conduct Unlikely**

94.     Also, there are four categories of circumstantial "plus" factors plausibly demonstrating Health First and Adventist are unlikely to be acting independently: (1) powerful collusive motive; (2) collusive communication at the highest level; (3) market structure encouraging Adventist's collusion to avoid the substantial barriers to its competitive entry into the BC relevant market for the sale of inpatient and emergency room acute care; and (4) market structure encouraging its purchase of a substantial collusive stake in Health First by Adventist to make easier increases in prices for both systems and the enforcement of market division.

95.     **Powerful Collusive Motive.** By selling at least a 30 percent share in its business and its monopoly profits, Health First has created a powerful motive for Adventist not to use its vast resources to compete with its monopoly in the BC relevant market. *See also infra* ¶ 112 (additional Adventist stake purchases).

96.     It blinks plausible economic reality to ignore that Adventist, having purchased a large, increasing share of Health First's monopoly profits, would then

---

[6]   https://www.adventhealth.com/business/adventhealth-central-florida-media-resources/news/health-first-partners-adventhealth-centra-care-deliver-urgent-care-across-brevard-county (9/27/19)

seek to extinguish those profits, and attack formidable barriers to entry, by entering the BC relevant market to compete independently.

97. **Collusive Communication at the Highest Level.** Health First and Adventist have many face-to-face opportunities to perfect the unlawful market division at the highest levels with the award to Adventist, under the 2019 Agreement, of two seats on the Health First Board of Directors. *Supra* ¶ 87 note 3. Firms bent on independent competition do not have representatives on each other's Boards privy to each other's competitive tactics and strategy.

98. **Market Structure Encouraging Adventist's Collusive Avoidance of Barriers to Entry in BC.** There are formidable barriers to independent market entry protecting Health First's monopoly in the BC relevant market (including in part Health First's pervasive manipulation of physician hospital referrals). *Supra* ¶¶ 34-37, 44-78. They make avoidance of these barriers by Adventist by collusion more likely.

99. **Market Structure Encouraging Adventist's Purchase of a Substantial Collusive Stake in Health First to Make Easier Increases in Prices in Both Systems and the Enforcement of the Market Division.** Further, Adventist's partial ownership of Health First makes it easier for the conspiracy to increase prices in both their systems and the unlawful market division more enforceable, as well as collusive protection of Health First's monopoly in the relevant market. Models of hospital competition, and recent empirical analysis of hospital prices, have found that tacit collusion between

hospital systems in adjacent markets is not as sustainable or profitable as direct control by the purchase of ownership.

100.    Over the years Adventist has not pursued hospital purchases in BC though they have been quickly expanding in other parts of central Florida. Instead, it has bought, as seen above, at least a 30% stake in the dominant hospital system in BC and the owner of the only major hospital in BC, Holmes Regional Medical Center.

101.    In BC and adjacent counties, Health First and Adventist control two of the largest three hospitals.[7]  In addition, as to the counties adjacent to the five- county area, Health First and Adventist control three of the four largest hospitals in this ten-county area. Finally, of the nine primary care hospitals in the ten-county area with more than 100 beds, Health First and Adventist control six. Thus any coordinated action in this part of Florida must include both Health First and Adventist.

102.    Models of hospital competition and recent empirical analysis of hospital prices have found that tacit collusion between hospitals in adjacent markets is not as sustainable or profitable as direct control.

103.    Recent economic scholarship has investigated the effects of changes in cross-market ownership of hospitals.[8] A cross-market merger is the case where two

---

[7] Based on number of beds, Holms Regional Medical center (514), Halifax Medical Center (435) and Adventist Hospital Memorial Medical (344) are the three largest hospitals in the 5-county area.

[8] "A Review of the Economic Literature on Cross-Market Health Care Mergers", Keith Brand and Ted Rosenbaum, *Antitrust Law Journal*, Vol. 82, No. 2, 2019, pp. 533-549, ("Brand and Rosenbaum").

hospitals that are not obvious substitutes for patients due to geographic separation come under common ownership. This research has found that when an out-of-market hospital merges with another hospital, or hospital system, hospital prices increase in both markets. Investigators have explored at least three mechanisms that could be driving this price effect: (a) mergers change hospitals' bargaining sophistication; (b) the hospitals are substitutes for some high-value services; and (c) the hospitals are substitutes for health insurance plans when constructing a network.[9]

104.    Insurers looking to include a major hospital in central Florida in their network have a limited number of choices. Three of the four largest hospitals in the area are controlled by Health First and Adventist. To the extent that Health First and Adventist could compete in the three ways described above, that competition has been foreclosed by Adventist's ownership and joint control of Health First.

105.    Cross-market ownership has been found to not only directly to increase prices, but also facilitates collusion that can be difficult or impossible to sustain through tacit collusion (conscious parallelism).

106.    On the surface, hospital markets seem like an unlikely place for tacit collusion to be sustainable. There are many prices and price adjustments via contracting happen relatively infrequently. Further, since many prices are negotiated via private contracts, it may be difficult to detect cheating from any collusive regime.

---

[9] Brand and Rosenbaum, p. 542.

107.   Nevertheless, as noted above, Schmitt documents an increase in prices following an increase in multimarket contact. Increases in multimarket contact have been associated in the theoretical literature with increased ease of tacit collusion. While some recent work discusses other ways in which multimarket contact could soften competition without collusion, its proposed mechanism involves transferring capacity across markets—a difficult task in health care."[10]

108.   By taking an active ownership interest in Health First, not only does Adventist benefit from any monopoly profits that Health First generates, but Adventist can also coordinate pricing across local markets much more efficiently than is possible with tacit collusion alone.

109.   Adventist's historic decision to not pursue the purchase of other hospitals that were for sale in BC is consistent with this model of cross-market collusion. These smaller hospitals were much less likely to generate the cross-market price increases found in other hospital combinations. The target hospitals are smaller, are not likely to attract patients from nearby markets, and are not substitutes for nearby major hospitals in insurer networks. In contrast, the purchase of ownership and control by Adventist in Health First, who does own the largest hospital in BC, effectively limits possible competition for inclusion in broad insurer networks.

110.   In sum Plaintiffs have presented much more than a short, plain statement of plausible conspiracy under Fed. R. Civ. P. 8(a)(2) by alleging strong and specific

---

[10] Brand and Rosenbaum, *supra* note 8 at 547 (footnotes omitted).

direct and circumstantial evidence making independent action unlikely. Presented is not mere speculation or conscious parallelism. Health First is given pointed, fair notice why its conspiratorial conduct is more likely than its independent conduct.

## ADVENTIST'S PARTIAL OWNERSHIP IN RESTRAINT OF TRADE

111.    Further, under Section 7 of the federal merger statute, the Clayton Act, 15 U.S.C. § 18, Health First's sale of a substantial partial ownership to Adventist,, and with it the creation of a "super regional system of care," is also unlawful because the purchase has substantially lessened Adventist's incentive to compete with Health First's entrenched monopoly, as well as made it easier for both systems to divide the BC relevant market and to collude to raise prices and enforce the unlawful market division. *Supra* ¶¶ 99-110.

112.    These unlawful results have only increased with Adventist's repeated buying of additional shares in Health First after 2019.

113.    To be sure the acquisition of a substantial share by one company in another may present no antitrust difficulties in the abstract. However, if such acquisition advances patently anticompetitive ends, as here, is unlawful under merger precedent.

## EXCLUSIVE DEALING

114.    Multiple Health First exclusionary practices induce health plans and physicians to refer a vast majority of acute care patients to Health First hospitals. These practices significantly limit competition for the provision of the relevant acute care and

foreclose competition in a large, substantial portion of the BC relevant market, limiting Health First's hospital competitors to less than 10% of the market in the aggregate.

115.   Health First leverages its control over health plans to induce exclusive dealing with Health First hospitals for the treatment of acute care patients and to foreclose substantial competition in the relevant market. *Supra* ¶¶ 44-55.

116.   It provides financial inducements to independent physicians to induce exclusive dealing with Health First as to treatment of acute care patients and to foreclose substantial competition in the relevant market. *Supra* ¶¶ 56-58.

117.   It uses revocation of physician hospital privileges to induce exclusive dealing with Health First as to treatment of acute care patients and to foreclose substantial competition in the relevant market. *Supra* ¶¶ 59-63.

118.   It makes coercive threats to physicians to induce exclusive dealing with Health First as to treatment of acute care patients and to foreclose substantial competition in the relevant market. *Supra* ¶¶ 64-66.

119.   It has used coercive retaliation against physicians to induce exclusive dealing with Health First as to treatment of acute care patients and to foreclose substantial competition in the relevant market. *Supra* ¶¶ 67-76.

120.   It has acquired the independent physician group MIMA in part to induce and reinforce exclusive dealing with Health First as to treatment of acute care patients and to foreclose a substantial competition in the relevant market. *Supra* ¶¶ 77-78.

## CLASS INJURY AND STANDING

121.    Over many years to the present, Health First has continued to exclude competition in the BC relevant market. As a consequence, its fees charged for inpatient and emergency room care to patients, and the health plans insuring patients, are substantially above competitive levels. They suffer antitrust price injury. These high fees do not attract entry because Health First acts to prevent relevant market entry, well as competitive expansion in the market, through its exclusionary conduct. Plaintiffs and the proposed Classes thus directly suffer price injury of the type the antitrust laws were intended to prevent, injury flowing from that which makes Health First's acts unlawful.

122.    Such supra-competitive pricing in the BC relevant market for the sale of inpatient and emergency room care is the type of injury the antitrust laws were plainly intended to prevent.

123.    Health First's misconduct has directly caused this injury to Plaintiffs and the proposed Classes. Plaintiffs and the Classes are motivated to enforce the antitrust laws because they have the natural economic self-interest in paying competitive rather than supra-competitive prices

124.    Whereas physician competitors of Health First, as noted, have pursued antitrust claims against Health First for its harm to *physician* competition in the relevant market, that lawsuit did not seek to recover and did not recover for the injuries

to the members of the proposed Classes. Denial of remedy to Plaintiffs and the Classes would be likely to leave a significant antitrust violation undetected or unremedied.

125.   Any overlaps in the facts and issues between this action and the action that physician competitors brought against Health First, and the settlement that they reached with Health First, did not concern the calculation of damages at issue in this action, which calculation involves conceptually and categorically different measures that pose no threat of duplicative recoveries.

## CLASS ALLEGATIONS

### Damage Class for Inpatient and Emergency Room Acute Care
### Federal Rule of Civil Procedure 23(a) Prerequisites

126.   Plaintiff Skipper represents a class of patients, and health plans, who purchase Health First inpatient and emergency room acute care from Health First. The class seeks relief for their direct payments to Health First for this relevant acute care on or after April 19, 2017. For patients who are insured by health plans, such payments are defined as their co-insurance payments computed as percentages of Health First's acute care fees, and not limited by health plan annual, out-of-pocket maximums or otherwise. Excluded from this class are (a) patient payments which are set at a fixed amounts by insurance plan or otherwise regardless of the cost of the procedure, including co-payments; (b) patient insurance deductible payments to Health First; (c) persons employed by Health First, Inc. and its subsidiaries and Adventist and its subsidiaries; (d) HF and Adventist Health plans; and (e) the Presiding Judge,

employees of this Court, and any appellate judges exercising jurisdiction over these claims as well as employees of that appellate court.

127. Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

    a.    The number of persons in the Class is in the thousands and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder is also impracticable because of the need to expedite judicial relief, and the Class Representative's lack of knowledge of the identity and addresses of all members of the Class.

    b.    There are numerous questions of law and fact arising from the pattern of monopolization and restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether Health First has market power; (2) whether it has monopolized and restrained trade in the acute care relevant market; and (3) whether this conduct, taken as a whole, has materially caused antitrust price injury on members of the Class.

    c.    The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representative and the members of the Class are similarly or identically harmed by the same

33

systematic and pervasive concerted action and supra-competitive pricing.

d.      The Class Representative and their counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representative and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representative and the other members of the Class.

## Federal Rule of Civil Procedure 23(b)(3) Prerequisites

128.    Prosecution of the damage claims of the Class is appropriate pursuant to Rule 23(b)(3) because:

a.      Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

b.      A class action is superior to other methods for the fair and efficient resolution of the controversy.

## Injunctive Class for Inpatient and Emergency Room Acute Care

## Federal Rule of Civil Procedure 23(a) Prerequisites

129.    Plaintiffs represent a class of acute care patients and health plans purchasing Health First inpatient and emergency room acute care seeking injunctive relief from Health First's exclusionary and anticompetitive conduct. Excluded from

34

the class are (a) persons employed by Health First, Inc. and its subsidiaries and Adventist and its subsidiaries; (b) HF and Adventist health plans; and (c) the Presiding Judge, employees of this Court, and any appellate judges exercising jurisdiction over these claims as well as employees of that appellate court.

130.   Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

a.   The number of persons in the Class is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the need to expedite judicial relief and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

b.   There are numerous questions of law and fact arising from the pattern of monopolization and restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether Health First has market power; (2) whether it has monopolized and restrained trade in the acute care relevant market; (3) whether this conduct, taken as a whole, threatens quality of care and future above-competitive pricing; and (4) the nature and extent of the injunctive relief available to the members of the Class.

c.    The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action and supra-competitive pricing.

d.    The Class Representatives and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representatives and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representatives and the other members of the Class.

**Federal Rule of Civil Procedure 23(b)(2) Prerequisites**

131.   The prosecution of the claims of the Class pursuant to Rule 23(b)(2) is appropriate because Health First has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Monopolization of the BC Acute Care Relevant Market
### in Violation of Section 2 of the Sherman Act

132.   Plaintiffs incorporate herein the allegations above in Paragraphs 1-4 (introduction); 5-12 (parties, jurisdiction and venue); 13-16 (interstate commerce); 17-37 (relevant market and market power); *38-78 (monopolization exclusionary conduct)*; 121-125 (class antitrust injury and standing); 126-131 (damage and injunctive class definitions and class prerequisites) in support of the federal monopolization claim as set out herein.

133.   Health First and its controlled subsidiaries, including its hospitals, health plans, and physicians, have monopolized the relevant market for the sale of BC inpatient and emergency room acute care.

134.   Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as its agencies or instrumentalities.

135.   Health First has market power in the relevant market and has willfully maintained that power over a number of years until this time.

136.   Competition in the relevant market has been harmed and the inpatient and emergency room acute care fees paid to Health First by patients and health plans are higher than competitive levels.

137.   BC inpatients and emergency room acute care patients and their health plans have thus suffered antitrust price injury materially caused by the exclusionary conduct when paying Health First directly for care and have been injured in their business and property and seek relief under Section 4 of the Clayton Act, 15 U.S.C. § 15.

138.   Health First's continuing exclusionary conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

139.   Plaintiffs respectfully request that this Court grant the following *claims for relief* in light of Health First's unlawful monopolization:

A.   Declare that Health First's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2, allowing treble damage relief to the BC Acute Care Damage Class as defined under Section 4 of the Clayton Act, 15 U.S.C. § 15;

B.   On behalf of the BC Acute Care Injunctive Class as defined, permanently enjoin Health First from continuing its unlawful actions under Section 16 of the Clayton Act, 15 U.S.C. § 26;

C.   Award reasonable attorneys' fees and costs as allowed by law;

D.   Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.   Grant such other and further relief as the Court deems just and equitable.

## SECOND CAUSE OF ACTION

**Horizontal Market Division in Restraint of Trade in
Violation of Section 1 of the Sherman Act**

140.   Plaintiffs incorporate the allegations above in Paragraphs 1-4 (introduction); 5-12 (parties, jurisdiction and venue); 13-16 (interstate commerce); 17-37 (relevant market and market power); **79-110** *(market division conspiracy)*; 121-125 (class antitrust injury and standing); 126-131 (damage and injunctive class definitions and class prerequisites) in support of the federal claims of unlawful market division as set out herein.

141.   Health First conspired to enter into an unlawful, horizontal market division with a large, actual potential competitor, Adventist, in the BC relevant market for the sale of inpatient and emergency room acute care. Health First and Adventist have conspired unlawfully to divide the care of BC inpatients in this relevant market. In aid of this market division, and facilitating the implementation of an unlawful anticompetitive conspiracy, by written agreement conspirator Health First has sold at least a 30 percent share in its BC health system to Adventist in 2019 and thereafter. It also has ceded, under the same written, conspiratorial agreement two seats on its Board of Directors, with the effect of facilitating the conspiracy to divide the relevant market.

142.    In addition to the conspiratorial 2019 Agreement, at least four, plausible circumstantial plus factors demonstrate that the conspiracy between Health First and AdventistHealth is more likely than their independent action.

143.    This market division is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

144.    In the alternative, Defendant's conduct unreasonably restrains trade under the rule of reason in the BC relevant market for the sale of inpatient and emergency room acute care. The conduct is not justified because the anticompetitive effects of Health First's conspiratorial conduct far outweigh any procompetitive effects.

145.    Inpatients and their health plans, and potentially emergency room patients and their health plans. have suffered antitrust price injury caused by the conspiracy when paying Health First directly supra-competitive pricing for their acute care in the BC relevant market and have been injured in their business and property and seek relief under Section 4 of the Clayton Act, 15 U.S.C. § 15.

146.    Plaintiffs respectfully request that this Court grant the following ***claims for relief*** in light of Health First's unlawful market division:

A.    Declare that Health First's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, allowing treble damage relief to the BC Acute Care Damage Class as defined under Section 4 of the Clayton Act, 15 U.S.C. § 15;

B.      On behalf of Acute Care Injunctive Class as defined permanently enjoin Health First from continuing its unlawful actions under Section 16 of the Clayton Act, 15 U.S.C. § 26;

C.      Award reasonable attorneys' fees and costs as allowed by law;

D.      Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.      Grant such other and further relief as the Court deems just and equitable.

### THIRD CAUSE OF ACTION

**Restraining Competition Via Sale of Partial Ownership
in Violation of Section 7 of the Clayton Act**

147.    Plaintiffs incorporate the allegations above in Paragraphs 1-4 (introduction); 5-12 (parties, jurisdiction and venue); 13-16 (interstate commerce); 17-37 (relevant market and market power); **79-110** *(market division conspiracy)*; 121-125 (class antitrust injury and standing); 126-131 (damage and injunctive class definitions and class prerequisites) in support of the federal claims of unlawful merger via sale of partial ownership as set out herein.

148.    Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly."

149.    Health First by conspiring with Adventist to implement an unlawful market division conspiracy as alleged has unlawfully sold at least a 30 percent partial

ownership share in its BC health system to Adventist, in 2019 and thereafter, substantially lessening competition in violation of Section 7 of the Clayton Act. It also has ceded two seats on its Board of Directors, with the effect of facilitating the conspiracy unlawfully to divide the BC relevant market for the sale of inpatient and emergency room acute care.

150.   The effect of such acquisition also assists Health First in its maintenance of its monopoly in this relevant market.

151.   Defendant's conduct unreasonably restrains trade in this relevant market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

152.   Plaintiffs and the proposed Classes as defined seek relief under Section 4 of the Clayton Act, 15 U.S.C. § 15, for injury to their business and property.

153.   Plaintiffs respectfully request that this Court grant the following *claims for relief* in light of Health First's unlawful exclusive dealing:

A.   Declare that Health First's conduct violates Section 7 of the Clayton Act, 15 U.S.C. § 18, allowing treble damage relief to the Acute Care Damage Class as defined under Section 4 of the Clayton Act, 15 U.S.C. § 15;

B.   On behalf of Acute Care Injunctive Class as defined permanently enjoin Health First from continuing its unlawful actions under Section 16 of the Clayton Act, 15 U.S.C. § 26;

C.   Award reasonable attorneys' fees and costs as allowed by law;

D.    Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.     Grant such other and further relief the Court deems just and equitable.

## FOURTH CAUSE OF ACTION

**Exclusive Dealing in Restraint of Trade in
Violation of Section 1 of the Sherman Act**

154.  Plaintiffs incorporate the allegations above in Paragraphs 1-4 (introduction); 5-12 (parties, jurisdiction and venue); 13-16 (interstate commerce); 17-37 (relevant market and market power); 114-120 *(exclusive dealing conduct)*; 121-125 (class antitrust injury and standing); 126-131 (damage and injunctive class definitions and class prerequisites) in support of the federal claims of exclusive dealing as set out herein.

155.  Various physicians, plans, individuals, firms, and corporations, not named as defendants herein, are induced by Health First to cooperate in aid of its exclusive dealing in the acute care relevant market.

156.  Multiple Health First continuing, exclusionary practices have induced health plans and physicians to refer acute care patients to Health First in aid of unlawful exclusive dealing.

157.  Defendant's conduct significantly limits competition for the provision of acute care.

158.  Defendant's conduct substantially forecloses competition in the BC relevant market for the sale of inpatient and emergency room acute care, and allows

43

Health First to limit its competitors to less than 10% market share in the aggregate. Defendant's exclusive dealing has foreclosed nearly all competition in the relevant market.

159.   Defendant's conduct unreasonably restrains trade in the relevant market under the rule of reason in violation of Section 1 the Sherman Act, 15 U.S.C. § 1. The conduct is not justified because the anticompetitive effects of Health First's conduct far outweigh any procompetitive effects.

160.   Patients and their health plans purchasing in the relevant market have suffered antitrust price injury materially caused by the exclusionary conduct when paying Health First directly for care and have been injured in their business and property, and seek relief, under Section 4 of the Clayton Act, 15 U.S.C. § 15.

161.   Plaintiffs respectfully request that this Court grant the following *claims for relief* in light of Health First's unlawful exclusive dealing:

    A.    Declare that Health First's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, allowing treble damage relief to the Acute Care Damage Class as defined under Section 4 of the Clayton Act, 15 U.S.C. § 15;

    B.    On behalf of Acute Care Injunctive Class as defined permanently enjoin Health First from continuing its unlawful actions under Section 16 of the Clayton Act, 15 U.S.C. § 26;

    C.    Award reasonable attorneys' fees and costs as allowed by law;

D.    Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.    Grant such other and further relief as the Court deems just and equitable.

## **FIFTH CAUSE OF ACTION**

### **Violation of Section Fl. Stat. § 542.19 of the Florida Antitrust Act**

162.   Plaintiffs incorporate herein the allegations above in Paragraphs 1-4 (introduction); 5-12 (parties, jurisdiction and venue); 13-16 (interstate commerce); 17-37 (relevant market and market power); *38-78 (monopolization exclusionary conduct)*; 121-125 (class antitrust injury and standing); 126-131 (damage and injunctive class definitions and class prerequisites) in support of the state monopolization claim set out herein.

163.   Health First's anticompetitive conduct violates the Florida Antitrust Act, Fl. Stat. §§ 542.15-542.36.

164.   Health First's monopolization of the BC relevant market for the sale of inpatient and emergency room acute care violates Fl. Stat. § 542.19, which makes it "unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state."

165.   Plaintiffs and the other members of the proposed Classes have suffered antitrust price injury and been injured in their business or property by this monopolization pursuant to Fl. Stat. § 542.22 and seek relief thereunder.

166.    Plaintiffs respectfully request that this Court grant the following *claims for relief* in light of Health First's unlawful monopolization:

A.    Declare that Health First's conduct violates the Florida Antitrust Act, allowing treble damage relief to the Acute Care Damage Class as defined under Fl. Stat. § 542.22(1);

B.    On behalf of Acute Care Injunctive Class as defined, permanently enjoin Health First from continuing their unlawful conduct under Fl. Stat. § 542.23;

C.    Award reasonable attorneys' fees and costs as allowed by law;

D.    Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.    Grant such and further relief as the Court deems just and equitable.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

Date: August 25, 2021                        BY: */s/ R. Stephen Berry*

Trial Counsel
R. Stephen Berry
*(Admitted Pro Hac Vice)*
Berry Law PLLC
1100 Connecticut Avenue NW
Suite 645
Washington, DC 20036
Telephone: (202) 296-1212
sberry@berrylawpllc.com

Trial Counsel
Tucker H.Byrd
Florida Bar No.381632
Min Cho
Florida Bar No. 754331
Byrd Campbell, P.A.
180 Park Avenue North, Ste 2A
Winter Park, FL 32789
Telephone: (407) 392-2285
Facsimile: (407)392-2286
TByrd @ByrdCampbell.com
MCho@ByrdCampbell.com

Trial Counsel
Jason H. Kim
*(Admitted Pro Hae Vice)*
Schneider Wallace Cottrell Konecky
LLP 2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
jkim@schneiderwallace.com

Ronald G. Meyer
Florida Bar Number 0148248
Meyer and Blohm, P.A.
Post Office Box 1547
Tallahassee, FL  32302
rmeyer@meyerblohmlaw.com
Telephone: (850) 878-5212

*Attorneys for Plaintiffs*

47

## Certificate of Service

I hereby certify that the foregoing was served this 25th day of August, 2021 on counsel of record via this Court's ECF system.

*/s/R. Stephen Berry*
**R. Stephen Berry**

48