# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

## CASE NO. 6:21-CV-0681-RBD-GJK

ANTHONY COLUCCI and
VANESSA LORRAINE SKIPPER,

      Plaintiffs,

v.

HEALTH FIRST, INC.,

      Defendant.

_____/

## HEALTH FIRST, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL (Doc. 126)

Defendant Health First, Inc. submits this memorandum in opposition to Plaintiffs' Motion to Compel (Doc. 126).

As set forth in detail below, Plaintiffs seek to compel Health First to produce hundreds of thousands of rows of non-emergency outpatient data that has nothing to do with the inpatient and emergency room hospital services that Plaintiffs allege comprise the relevant product market and basis for the class definition in this case.[1]  Because the non-emergency outpatient data Plaintiffs seek has nothing to

---

[1]  Data exists for four groups of patient services: (1) inpatient services for patients who were admitted through the emergency room; (2) outpatient services for patients who were admitted through the emergency room; (3) inpatient services for patients who were not admitted through the emergency room; and (4) outpatient services for patients who

do with the services at issue in this case or the class that Plaintiffs seek to certify,

Plaintiffs' Motion to Compel should be denied.[2]

## FACTUAL BACKGROUND

Plaintiffs repeatedly have limited the relevant product market in this case

and the class definition to *inpatient* and *emergency room* services:

- "The relevant product market with respect to Health First's misconduct encompasses the sale of *inpatient* and *emergency room* acute care."

  Second Amended Complaint ¶17 (Doc. 53) ("SAC") (emphasis added); *see also id.* at ¶¶4, 18, 126.

- Plaintiffs' class definition: "patients, and health plans, who purchase Health First *inpatient* and *emergency room* acute care . . ."

  Motion for Class Certification at 1 (Doc. 96) ("CM") (quoting SAC ¶126) (emphasis added).

- At the July 21, 2021 preliminary pretrial conference:

  THE COURT: . . . tell me in much more simple terms who is it that you think has been injured by these anticompetitive practices that you allege on the part of Health First and how are you going to identify them.

---

were not admitted through the emergency room.  Health First has agreed to produce, and has produced, data for groups (1)-(3).  Plaintiffs' Motion concerns data for group (4), non-emergency outpatient services.

[2] The parties' meet and confers on Plaintiffs' expansion of their requests from "inpatient and emergency room" care to "acute care services" have been focused primarily on billing and payment data, not other data or documents.  Based on recent communications with Plaintiffs' counsel, the parties believe they will be able to resolve any of Plaintiffs' remaining concerns following the Court's ruling on the scope of discovery regarding billing and payment data.

> MR. BERRY:  Persons that received acute care treatments from Health First from April 2017 to the present.  Those persons include patients that have got ***inpatient care from Health First or emergency room acute care.***
>
> It's an acute care class.  ***It's not outpatient allegations.***
>
> . . .
>
> MR. BERRY:  Our theory is, Your Honor, everyone that went to the Health First facilities to get ***either emergency room or inpatient acute care*** since April 2017 is in the class.
>
> Prelim. Pretrial. Conf. Tr. at 8:3-13, 9:12-15 (**Exhibit A**) (emphasis added).

When Health First sought to compel Plaintiffs to produce information regarding the <u>out</u>patient services the named Plaintiffs had personally received, including for all "acute care" services they had received, Plaintiffs objected and represented to the Court that the relevant product market was "inpatient and emergency room" acute care:

- "The issue in this case is whether Defendant charged monopolistic prices for acute care services as sold ***in the relevant market for acute inpatient or emergency room care*** from April 19, 2017 to present[.]"

- "Defendant's monopoly overcharge for [a] broken arm ER visit during the Damage Period is relevant and proportional to the needs of this case; ***outpatient treatments are not.***"

- "[Plaintiffs'] allegations clearly establish that acute care and outpatient medical services do not compete in the same market."

Pltfs.' Resp. to Mot. to Compel at ¶¶4, 5, 7 (Doc. 46) (emphasis added); *see also* Pltfs.' Resp. to Def.'s 1st RPDs at 5-14 (**Exhibit B**) (objecting to producing documents other than for Plaintiffs' "inpatient or emergency room acute care");

3

Pltfs.' Resps. to Def.'s 2d RPDs at 6-11 (**Exhibit C**) (objecting to the production of "outpatient medical records" other than emergency room acute care).

Consistent with Plaintiffs' allegations, representations to the Court, and discovery responses, Plaintiffs' First Set of Requests for Production of Documents to Health First (the "First Requests") sought certain data for "inpatient or emergency care" provided by Health First. *See* 6/22/21 Pltfs.' 1st Rqsts. at No. 3 ("inpatient care or emergency care") (**Exhibit D**); *see also id.* at Nos. 5 ("inpatient care or emergency care"), 11-12 ("inpatient admissions"), 15-19 ("inpatient care or emergency care"), 20 ("inpatient pricing or emergency pricing"), 22 ("inpatient care or emergency room care"), 26 ("inpatient care or emergency care," "inpatient care pricing or emergency care pricing"), 27 & 33 ("inpatient care or emergency care"), 34 ("inpatient care or emergency room care"), 35-36 ("inpatient care or emergency care"). *None* of the requests in Plaintiffs' First Requests sought data or documents for *all* "acute care" services or *all* outpatient services. *See id.*

In April 2022, in connection with expert class certification discovery and in response to Plaintiffs' First Requests, Health First produced over *340,000* rows of de-identified patient-level records containing billing and payment data for inpatient and emergency services, which is the market that is the subject of the SAC and Plaintiffs' class definition. *See* 4/22/22 email (**Exhibit E**); 6/22/22 email (**Exhibit F**).

On June 14, 2022, Plaintiffs demanded that Health First immediately produce "billing data showing reimbursements by payors." 6/14/22 email (**Exhibit G**).

In a meet and confer held on June 22, 2022, Health First pointed Plaintiffs' counsel to the previously produced patient-level billing and payment data for inpatient and emergency services and advised that, if Plaintiffs' expert needed additional data fields, to advise Health First what specific additional data fields he needed. *See* 6/22/22 email (**Exhibit F**).

On June 28, 2022, even though Plaintiffs had not served any discovery requests for outpatient data generally, Plaintiffs asserted that Health First had refused to produce <u>out</u>patient data. *See* 6/28/22 letter (**Exhibit H**).

On June 30, 2022, Health First corrected Plaintiffs' assertion that Health First had refused to produce outpatient data. As Health First explained, it agreed to produce – and already had produced – emergency outpatient data, which is what Plaintiffs had pled in the SAC and sought in their document requests. *See* 6/30/22 letter (**Exhibit I**). Moreover, once Plaintiffs provided Health First with the additional specific data fields that Plaintiffs' expert required, Health First agreed to produce revised inpatient and emergency outpatient data reflecting those additional data fields. *See* Pltfs.' Unopp. Mot. for Disc. Conf. at 5 (Doc. 125).

On July 9, 2022, ***for the first time,*** Plaintiffs served discovery requests

seeking data for all "acute care services" – including data for unidentified "acute care" non-emergency outpatient services (the "Second Requests").[3]  *See* 7/9/22 Pltfs.' 2d Reqsts. at Nos. 1, 3 (**Exhibit J**).  In the Second Requests, Plaintiffs defined "acute care services" to mean "short-term health-care treatments that patients receive at a hospital to address an acute, trauma or urgent need . . ." and, for the first time, included the phrase "whether categorized by you as inpatient care, outpatient care, emergency care, or otherwise."  *Compare id.* at Def. No. 11 (**Exhibit J**) *with* 6/22/21 Pltfs.' 1st Rqsts. at Def. No. 13 (**Exhibit D**).

Health First has objected to the Second Requests, among other reasons, as seeking information for services that are not objectively identifiable and that are beyond the scope of the relevant product market and class definition in this case. *See* HF Resp. & Obj. to 2d Rqsts. (Doc. 126-1).  Plaintiffs have not been able to explain which services they assert address "acute, trauma or urgent need[s]" in the context of scheduled outpatient services.

---

[3] By the time Plaintiffs first asked for such information, several key milestones and deadlines had already been reached or had passed, including: (i) the deadline to amend pleadings, November 19, 2021; (ii) the issuance of both parties' expert reports on class certification, February 18, 2022 and March 18, 2022; (iii) depositions of both named Plaintiffs, March 30, 2022 and April 1, 2022; (iv) depositions of both parties' experts on class certification, March 14, 2022 and April 28, 2022; and (v) Plaintiffs' Motion for Class Certification (Doc. 96), May 20, 2022, and Health First's Opposition (Doc. 105), June 21, 2022.  Dr. Gale, Plaintiffs' expert, made clear in his report and deposition that the only services he considered for the relevant product market were inpatient and emergency room services.  *See* CMSO at 3 (Doc. 41); CM at Ex. A at 1, 2, 4, 9, Exs. B, C and J (Docs. 96-1, -2, -3, -10); Opp. to CM at Ex. B at 10:1-10, 14:7-9, 100:7-15, Ex. G (Docs. 105-2, -7).

## ARGUMENT

**A.**   **Plaintiffs' Second Requests Seek Information Beyond the Scope of Their Pleadings and What They Themselves Have Agreed to Produce As Being Within the Scope of This Case.**

Rule 26 provides that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26((b)(1).  Here, Plaintiffs seek to compel Health First to produce data that has nothing to do with the two specific categories of hospital services that Plaintiffs allege constitute the relevant product market and form the class definition in this case – namely, inpatient and emergency room services.  *See* SAC ¶¶17, 126; CM at 1; Pltfs.' Resp. to Mot. to Compel at ¶¶4, 5, 7 (Doc. 46).

Health First has already produced patient-level billing and payment data for inpatient services (including inpatient emergency services), first in April 2022 and again on August 29, 2022 (with the additional fields Plaintiffs requested).  *See* 4/22/22 email (**Exhibit E**); 8/29/22 email (**Exhibit K**).  This data includes records for more than 115,000 inpatient visits.  HF also already produced patient-level billing data for approximately 227,000 outpatient emergency services. *See* 4/22/22 email (**Exhibit E**).  Based on the specific additional data fields identified by Plaintiffs' expert, Health First is also working to produce revised data with the specific fields of data that Plaintiffs recently requested.

Instead, the parties' dispute centers on the scope of the <u>out</u>patient data to be produced.  Health First agreed to produce data for emergency outpatient services, consistent with Plaintiffs' allegations, Plaintiffs' class definition, and Plaintiffs' representations to the Court about what is and is not in the relevant product market.  *See* Pltfs.' Unopp. Mot. for Disc. Conf. at 5 (Doc. 125).  Plaintiffs, on the other hand, seek data for "***all*** acute care" outpatient services; however, because they cannot identify what those services are in order for Health First to pull that data, Plaintiffs are now requesting data for *all* outpatient services, including emergency and non-emergency, without limiting that data to "acute care" services.  *See* Pltfs.' Mot. to Compel at ¶¶1, 7 (Doc. 126).

As a threshold matter, "the pleadings frame the issues in the case." *Pierson v. Orlando reg. Healthcare Sys., Inc.,* No. 6:08-cv-466-Orl-28GJK, 2010 WL 11508728 *3 (M.D. Fla. May 5, 2010) (denying motion to compel where plaintiff did not "reasonably tailor" the discovery requests to the needs of the case); *Freytes-Torres v. City of Sanford, Fla.,* No. 6:06-cv-1779-Orl-22GJL, 2008 WL 11336656 (M.D. Fla. May 27, 2008) (denying motion to compel where the requested discovery covers events that have no bearing on the claims and defenses raised in the case).  Here, as set forth above, the SAC, Plaintiffs' own discovery responses, and Plaintiffs' representations to the Court all frame the issues in this case around "inpatient and emergency room" services.  As Plaintiffs themselves argued and acknowledged,

non-emergency outpatient "acute care services" – even if Plaintiffs had identified

them – are outside the scope of Plaintiffs' claims in this case.  *See, e.g.*, Pltfs.' Resp.

to Mot. to Compel at ¶7 (Doc. 46) ("[Plaintiffs'] allegations clearly establish that

acute care and outpatient medical services do not compete in the same market.");

Pltfs.' Resps. to Def.'s 2d RPDs at No. 9 (**Exhibit C**) (objecting to producing

documents relating to services Plaintiffs received "to address an acute, trauma or

urgent need" other than those for "inpatient or emergency room care"); Prelim.

Pretrial. Conf. Tr. at 8:12-13 (**Exhibit A**) ("It's not outpatient allegations.").

## B.   Plaintiffs Have Not Identified What Non-Emergency Outpatient Services Constitute "Acute Care Services."

Even if Plaintiffs had a basis for seeking discovery of non-emergency

outpatient "acute care services" (*i.e.,* "acute care services" that are neither inpatient

nor emergency room services, which Health First has already agreed to produce),

Health First does not know what non-emergency outpatient services Plaintiffs

believe constitute "acute care" and what services do not.  Thus, as part of the meet

and confer process relating to Plaintiffs' Second Requests, Health First asked

Plaintiffs' counsel to identify the *specific* service codes that Plaintiffs assert

correspond to "acute care services" and for which Plaintiffs were requesting data.

*See* 8/10/22 email (**Exhibit L**).  Without such codes, Health First does not know

how to identify what services (and what patients) Plaintiffs believe are part of the

case and for which to pull data.  *See* Opp. to CM at 9-12 (addressing the vague and

subjective nature of Plaintiffs' understanding of "acute care" services).

Nor have Plaintiffs suggested to Health First how it may go about identifying those services.  Indeed, on August 15, 2022, during another meet and confer, Plaintiffs' counsel admitted that they cannot provide any codes or other basis to identify the "acute care services" for which they seek data.[4]  Instead, Plaintiffs proposed that Health First produce data for *all* outpatient services, including *all* non-emergency outpatient services, even though that data would necessarily include a large number of services that indisputably do not qualify as "acute care services" under Plaintiffs' own description.  Plaintiffs' counsel explained that, once they had all of the outpatient data in hand, they would figure out how to identify which services constituted "acute care services."  Plaintiffs' counsel did not explain in the meet and confer how they would make such a determination based on the billing and payment data they requested, or what the criteria would be for such a determination.  Plaintiffs' Motion to Compel provides no explanation for how Plaintiffs will make this determination, either.  *See* Mot. to Compel at 4.

In fact, the criteria that Plaintiffs themselves have used to try to distinguish

---

[4]  Nor have Plaintiffs attempted to explain how non-emergency outpatient services could be part of a market that also includes inpatient and emergency services.  This is the same reason that the court removed hospital-based outpatient services from a class definition that included inpatient hospital services in *In re Northshore Univ. Health Sys. Antitrust Litig.*, No. 07-cv-4446, 2018 WL 2383098, *5 (N.D. Ill. Mar. 31, 2018).

between the services provided to Mrs. Colucci and Ms. Skipper that they call "acute care" versus the services they claim were not "acute care" illustrate the vague, subjective nature of Plaintiffs' definition of "acute care services."[5] Ms. Skipper asserts that her 2020 procedure was "acute care" because she had "severe periodic uterine pain," at a pain level of "8 or 9" out of 10.  CM at 4-5; Skipper Depo. 166:9-15 (Doc. 105-3). As to Mr. Colucci, he testified that his wife's first outpatient surgery (a double mastectomy to treat breast cancer) was "acute care," but that her second surgery (for reconstruction) was not "acute care" because her cancer had already been removed, and it "wasn't urgent." CM at 5, n.8; Opp. to CM at Ex. A at 38:20-24 (Doc. 105-1)).

Health First raised the issue of Plaintiffs' inability to identify clear, objective criteria for "acute care services" in its June 21, 2022 Opposition to Plaintiffs' Motion for Class Certification, explaining that the lack of clear, objective criteria renders a class based on "acute care services" inadequately defined and not clearly ascertainable.  *See* Opp. to CM at 9-12 (Doc. 105).  Now, more than two months

---

[5]  During the depositions of named Plaintiffs, when it became clear that neither Mrs. Colucci nor Ms. Skipper received "inpatient or emergency room care" (SAC ¶17), Plaintiffs attempted to recharacterize the product market described in the SAC as one for "acute care" services more generally.  *See, e.g.,* Opp. to CM at Ex. A at 132:9-133:1 (Doc. 105-1); *Id.* at Ex. C at 10:2-11:2, 60:24-61:6, 155:2-10, 155:24-156:1, 167:7-12 (Doc. 105-3).  As Health First explained in its opposition to Plaintiffs' Motion for Class Certification, the fact that the services named Plaintiffs received fall outside of the relevant product market and class definition is a fundamental roadblock to them serving as representatives for the class.

later, Plaintiffs still have not presented any method for determining what services constitute "acute care," much less an objective one.

Because of their own inability to identify "acute care services," Plaintiffs seek to compel Health First to produce all outpatient data, which will necessarily include massive amounts of patient-level data for non-emergency, non-acute care services that everyone agrees have nothing to do with this case.  It is undisputed that many, if not the majority, of the non-emergency outpatient services provided by Health First do not constitute "acute care" services even under Plaintiffs' vague description and thus, according to Plaintiffs, are not part of this case.  Indeed, Plaintiffs acknowledged in their Motion for Class Certification and in their deposition testimony that several of the outpatient services that Mrs. Colucci and Ms. Skipper received at a Health First hospital during the class period were not "acute care" and are not part of this case:

- Mr. Colucci "is *not* claiming for his plan related, non-acute care which was not urgent." CM at 5, n.8 (emphasis in original).

- Mrs. Skipper "is *not* claiming for related care which was not urgent, acute care." *Id.* at 5, n.7 (emphasis in original).

- Mr. Colucci: "Not seeking damages on the reconstructive surgery because we do not feel that is acute care.  It wasn't urgent.  It was an elective procedure." Opp. to CM at Ex. A at 38:20-24 (Doc. 105-1).

- Ms. Skipper identifies two outpatient services she received during the class period that in her view are not "acute care." *Id.* at Ex. C at 169:2-10 (Doc. 105-3).

12

These are the exact kinds of services – non-emergency, non-acute care outpatient services that Plaintiffs admitted are not at issue in this case – that Plaintiffs now seek to compel Health First to produce.

**C.     Plaintiffs Seek to Impose a Massive Expansion of Health First's Data Collection.**

Expanding the scope of outpatient data production from "emergency room care" to *all* outpatient care would have a massive impact on the amount of data Health First would need to collect.  If limited to emergency outpatient care, which Health First has already agreed to produce, Health First estimates it would produce approximately 700,000 rows of data for the time frame of October 1, 2017 through June 30, 2022.  *See* Declaration of M. Harris ¶5 (**Exhibit M**).  If Health First were required to produce data for *all* outpatient care, the number of rows would increase to more than 2.2 million.  *See id.* at ¶4.  A substantial portion of this data is likely to be for routine diagnostic tests, lab work, and non-urgent elective procedures and services.  Given that Plaintiffs themselves assert that more than half of the outpatient services Mrs. Colucci and Ms. Skipper collectively received do not constitute "acute care," a rough estimate is that more than half of the data would correspond to outpatient services that do not constitute "acute care services" even under Plaintiffs' own description.

Plaintiffs have offered no basis for requiring Health First to produce, and Health First's expert to process and analyze, hundreds of thousands of rows of

13

highly confidential patient-level data for services that have no bearing on this case.[6]

Accordingly, Plaintiffs' Motion to Compel should be denied.

Dated: September 1, 2022                 Respectfully submitted,

                                         /s/ Elizabeth B. Honkonen
                                         Richard Alan Arnold (FBN 196643)
                                         Deborah S. Corbishley (FBN 588229)
                                         Robert D. W. Landon, III (FBN 961272)
                                         Elizabeth B. Honkonen (FBN 0149403)
                                         Christina M. Ceballos-Levy (FBN 0411965)
                                         KENNY NACHWALTER, P.A.
                                         Four Seasons Tower - Suite 1100
                                         1441 Brickell Avenue
                                         Miami, FL 33131
                                         Telephone: (305) 373-1000
                                         Facsimile:  (305) 372-1861
                                         rarnold@knpa.com
                                         dsc@knpa.com
                                         rlandon@knpa.com
                                         ebh@knpa.com
                                         ccl@knpa.com

                                         *Attorneys for Defendant Health First, Inc.*

---

[6] In their Motion to Compel, Plaintiffs cite to *In re Photochromic Lens Antitrust Litig.*, 279 F.R.D. 620 (M.D. Fla. 2012), and *US Connect, LLC v. Capital Solutions Bancorp LLC,* No. 2:12-cv-00615-29DNF, 2014 WL 12616969 (M.D. Fla. April 4, 2014).  Neither case stands for the proposition that a party is entitled to discover information (here, data for non-acute non-emergency outpatient services) that is not relevant to the case.  In *In re Photochromic Lens Antitrust Litig.,* the court denied the motion to compel in part specifically to exclude products that were not functional substitutes for the products at issue.  279 F.R.D. at 625-26.  In *US Connect,* the court found that, unlike here, the plaintiff's requests were "narrowly tailored" and limited to seeking the "financial and accounting records pertaining to the specific transactions which are the subject matter of this litigation."  2014 WL 12616969 at *3.